IN THE SUPREME COURT OF NORTH CAROLINA

No. 181A16

Filed 10 May 2019

LAWRENCE PIAZZA and SALVATORE LAMPURI

v.

DAVID KIRKBRIDE, GREGORY BRANNON, and ROBERT RICE

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 246 N.C. App. 576, 785 S.E.2d 695 (2016), affirming a judgment entered on 13 March 2014 and an order entered on 11 April 2014, both by Judge G. Bryan Collins, Jr., in Superior Court, Wake County. On 18 August 2016, the Supreme Court allowed defendant's petition for discretionary review of additional issues. Heard in the Supreme Court on 20 March 2017.

*Poyner Spruill LLP, by Steven B. Epstein and Andrew H. Erteschik, for plaintiff-appellees.*

*Smith Moore Leatherwood LLP, by Matthew Nis Leerberg and Mark A. Finkelstein, for defendant-appellant Gregory Brannon.*

ERVIN, Justice.

In this case, we are called upon to decide whether the Court of Appeals erred by determining that the trial court did not err by refusing to grant a new trial to a defendant who was held liable pursuant to N.C.G.S. § 78A-56(a)(2), which prohibits a person from selling securities by means of false and misleading statements of

material fact. After carefully considering the record in light of the applicable law, we modify and affirm the Court of Appeals' decision to uphold the trial court's judgment.

## I. Factual Background

## A. Substantive Facts

Defendant Gregory Brannon[1] met plaintiff Lawrence Piazza in 1986, when they were both students at the University of Chicago Medical School. After graduating from medical school, Dr. Piazza became an eye surgeon while defendant practiced obstetrics and gynecological medicine. Defendant met Robert Rice in the early 1990s. Defendant, along with Dr. Piazza, invested in Arckosian, a start-up entity that Mr. Rice had founded that later went out of business. Following the demise of Arckosian, Mr. Rice co-founded, with David Kirkbride, a company called Z Reality. In 2006, defendant met John Cummings when Mr. Cummings accompanied his wife to a prenatal appointment. Similarly, defendant met plaintiff Salvatore Lampuri during defendant's attendance upon Mr. Lampuri's wife in connection with the birth of the couple's first child.

In 2007, Mr. Rice and Mr. Kirkbride founded Neogence Enterprises, Inc., a technology company that had developed and was attempting to market an augmented reality application for smartphones known as Mirascape. The funding upon which Neogence relied was provided by "angel investors," including Dr. Piazza, who received

---

[1] We will refer to defendant Gregory Brannon as defendant throughout the remainder of this opinion.

convertible promissory notes in connection with the making of their investments. Mr. Rice served as Neogence's Chief Executive Officer, with responsibility for fundraising and technical development, while Mr. Kirkbride assisted with Neogence's fundraising efforts. Defendant became a member of Neogence's board of directors, upon which he served with Mr. Rice and Mr. Kirkbride. In 2009, Mr. Cummings joined Neogence as Chief Sales Officer.

On 29 April 2010, Mr. Cummings attended a social event in New York at which he met an account executive from McGarry Bowen, an advertising agency that served a number of clients, including Verizon Wireless. The McGarry Bowen account executive invited Mr. Cummings to a meeting with Verizon that had been scheduled for the following day. At the 30 April 2010 meeting, Mr. Cummings described the work that Neogence was doing to various McGarry Bowen employees and a Verizon executive. During the course of this meeting, a McGarry Bowen account executive told Mr. Cummings that McGarry Bowen would consider using Mirascape as part of an upcoming advertising campaign in the event that Neogence was able to develop Mirascape consistently with McGarry Bowen's expectations.

After the meeting ended, Mr. Cummings discussed what had happened with defendant, Mr. Rice, and Mr. Kirkbride. On the same date, defendant e-mailed Dr. Piazza for the purpose of informing him of what had occurred during the McGarry Bowen meeting and stating that Neogence needed an additional $100,000.00 to $200,000.00 as quickly as possible to take advantage of the opportunity that had

arisen during the McGarry Bowen meeting. Later that day, Mr. Rice sent an e-mail to Dr. Piazza seeking an additional $200,000.00 in "angel funding" relating to this "opportunity." On 28 May 2010, Dr. Piazza invested an additional $150,000.00 in Neogence following a meeting with Mr. Cummings and Mr. Kirkbride. In addition, defendant, Mr. Rice, and other Neogence agents discussed what had happened at the McGarry Bowen meeting with Mr. Lampuri. Subsequently, Mr. Lampuri made an investment in Neogence as well.

Unfortunately, Neogence was unable to get Mirascape to function properly in a timely manner. During the following year, Neogence began to experience financial difficulties. After failing to comply with Dr. Piazza's request that his investment be returned in accordance with the provisions of his convertible promissory notes, Neogence ceased doing business in early July 2011. Dr. Piazza eventually filed suit against Neogence to enforce the convertible promissory notes and obtained the entry of a default judgment.

## B. Procedural History

On 10 October 2012, plaintiffs filed a complaint against defendant, Mr. Kirkbride, and Mr. Rice in which they sought to recover damages from defendants on the basis of allegations that defendants had committed material violations of the North Carolina Securities Act. In apt time, defendants filed responsive pleadings in which they sought dismissal of plaintiffs' complaint, denied the material allegations of plaintiffs' complaint, asserted various counterclaims and crossclaims, and raised

various affirmative defenses, including, but not limited to, contributory negligence, failure to mitigate damages, failure to show reasonable reliance, unclean hands, and waiver and estoppel. On 25 November 2013, Judge Donald W. Stephens entered an order granting summary judgment in favor of Mr. Kirkbride and refusing to grant summary judgment in favor of defendant and Mr. Rice.

The issues between plaintiffs and the remaining defendants came on for trial before the trial court and a jury at the 10 February 2014 civil session of Superior Court, Wake County. At the conclusion of the trial, the trial court submitted the following issues to the jury for the purpose of determining whether plaintiffs were entitled to recover damages from defendant based upon a violation of N.C.G.S. § 78A-56(a)(2)[2]:

> ISSUE 1:
>
> Did Defendant, Gregory Brannon, in soliciting the Plaintiff, Lawrence Piazza, to pay money for a security, make a statement which was materially false or misleading, or which under the circumstances was materially false or misleading because of the omission of

---

[2] N.C.G.S. § 78A-56(a)(2) imposes civil liability upon anyone who:

> Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

N.C.G.S. § 78A-56(a)(2) (2017).

other facts, where the Plaintiff, Lawrence Piazza, was unaware of the true or omitted facts?

ANSWER: Yes

If you answer the first issue "yes," move to the second issue. If you answer the first issue "no," move to the third issue.

ISSUE 2:

Did the Defendant, Gregory Brannon, not know and in the exercise of reasonable care, could not have known of the untruth or omission in his offer or sale of a security to the Plaintiff, Lawrence Piazza?

ANSWER:  No

No matter your verdict on the first and/or second issues, move to the third issue.

ISSUE 3:

Did the Defendant, Gregory Brannon, in soliciting the Plaintiff, Salvatore Lampuri, to pay money for a security, make a statement which was materially false or misleading, or which under the circumstances was materially false or misleading because of the omission of other facts, where the Plaintiff, Salvatore Lampuri, was unaware of the true or omitted facts?

ANSWER: Yes

If you answer the third issue "yes," move to the fourth issue.  If you answer the third issue "no," move to the fifth issue.

ISSUE 4:

Did the Defendant, Gregory Brannon, not know and in the exercise of reasonable care, could not have known of the

untruth or omission in his offer or sale of a security to the
Plaintiff, Salvatore Lampuri?

ANSWER:  No

On the other hand, in answering the same questions regarding Mr. Rice, the jury determined that Mr. Rice had not made any false or misleading statements to plaintiffs.  On 13 March 2014, the trial court entered a judgment ordering defendant to pay $150,000.00 in compensatory damages to Dr. Piazza and $100,000.00 in compensatory damages to Mr. Lampuri and to pay plaintiffs $123,804.00 in attorney's fees and $8,493.79 in costs, plus interest.  On 17 March 2014, defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.  On 11 April 2014, the trial court denied defendant's motion.  On 21 April 2014 and 5 May 2014, defendant noted an appeal from the final judgment, the order awarding costs and attorneys' fees, and the order denying his motion for judgment notwithstanding the verdict or a new trial to the Court of Appeals.

In challenging the trial court's judgment and orders before the Court of Appeals, defendant argued that the trial court had erred by determining that plaintiffs had sufficiently established that defendant was liable to plaintiffs pursuant to N.C.G.S. § 78A-56(a)(2), including whether defendant was primarily or secondarily liable and whether plaintiffs were required to prove that defendant acted with scienter; declining to instruct the jury concerning the extent to which defendant was entitled to rely upon the director safe harbor provision set out in N.C.G.S. § 55-8-

30(b); denying defendant's motion for a new trial on the grounds that the verdict was impermissibly inconsistent; and ordering defendant to pay attorneys' fees to plaintiffs. *Piazza v. Kirkbride*, 246 N.C. App. 576, 600-01, 603, 611, 614, 785 S.E.2d 695, 710-12, 717, 719 (2016). On 5 April 2016, the Court of Appeals filed an opinion concluding that " 'any person' who is a seller or offeror" of securities is liable pursuant to N.C.G.S. § 78A-56(a). *Id.* at 603, 785 S.E.2d at 712. In addition, the Court of Appeals held that "a section 78A-56(a)(2) civil plaintiff need not prove *scienter*," so that "a materially false or misleading statement or omission made in connection with a security offer or sale is actionable even if the person making the statement or omission did not know it was false, so long as the person was negligent under section 78A-56(a)(2)," *id.* at 601, 785 S.E.2d at 711, and that "a defendant does not have to be a securities professional to be liable under the" North Carolina Securities Act, *id.* at 602, 785 S.E.2d at 712. Moreover, the Court of Appeals rejected defendant's contention that the trial court had erred by refusing to deliver a director safe harbor instruction given that "the jury found [defendant] liable to Plaintiffs . . . for his individual representations, which were the product of his own acts," rather than "his directorial responsibilities set out by the board," *id.* at 605-06, 785 S.E.2d at 713-14, and that defendant had "waived the Safe Harbor affirmative defense" by failing to plead it, *id.* at 609, 785 S.E.2d at 716. Finally, the Court of Appeals observed that "it is not illogical or inconsistent for two [Securities Act] defendants to achieve different results in a single action." *Id.* at 611, 785 S.E.2d at 717. Although a majority of the

Court of Appeals affirmed the challenged trial court decisions, Judge Tyson filed a partial dissent in which he concluded that "[t]he trial court erred by failing to instruct the jury on the Director Safe Harbor provision as [defendant] requested in light of the evidence presented," *id*. at 615, 785 S.E.2d at 719-20 (Tyson, J., concurring in part and dissenting in part), and that the jury's verdicts with respect to defendant's liability to Dr. Piazza were impermissibly inconsistent with the jury's verdict with respect to Mr. Rice's liability to Dr. Piazza on the grounds that it was "extreme, legally unsound, and patently illogical" "[t]o deem [defendant] Brannon's statements to [plaintiff] Piazza as 'securities fraud,' while acquitting [defendant] Rice, the Chief Executive," *id*. at 615, 785 S.E.2d at 720.

On 10 May 2016, defendant noted an appeal to this Court from the Court of Appeals' decision based upon Judge Tyson's dissent. On 18 August 2016, this Court allowed defendant's petition for discretionary review with respect to additional issues.

## II. Substantive Legal Analysis

### A. Inconsistent Verdicts

In seeking to persuade us to reverse the Court of Appeals' decision, defendant initially argues that the trial court erred by denying his motion for a new trial on the grounds that the jury's determinations that defendant, but not Mr. Rice, made false and misleading statements to plaintiffs "are so contradictory as to invalidate the judgment" given that the statements that defendant and Mr. Rice made to plaintiffs

were essentially identical, quoting *Palmer v. Jennette*, 227 N.C. 377, 379, 42 S.E.2d

345, 347 (1947). In defendant's view, the Court of Appeals erred by reconciling the

jury's verdicts based upon the relative strength of the showings that defendant and

Mr. Rice made with respect to the reasonable care issue. Although we agree with

defendant that the logic upon which the Court of Appeals relied in upholding the trial

court's decision to deny defendant's new trial motion was faulty, we do not believe

that the trial court abused its discretion by rejecting defendant's contention that the

jury's verdicts were impermissibly inconsistent.[3]

"The trial judge has the discretionary power to set aside a verdict when, in his

opinion, it would work injustice to let it stand; and, if no question of law or legal

inference is involved in the motion, his action in so doing is not subject to review on

appeal in the absence of a clear abuse of discretion." *Selph v. Selph*, 267 N.C. 635,

637, 148 S.E.2d 574, 575-76 (1966) (first citing *Goldston v. Wright*, 257 N.C. 279, 279,

125 S.E.2d 462, 463 (1962) (per curiam); then citing *Walston v. Greene*, 246 N.C. 617,

---

[3] The trial court, without objection from defendant, instructed the jury that "a statement or omission is material if the information disclosed or the information omitted would have assumed actual significance in the deliberations of a reasonable investor" and that "the plaintiffs do not need to prove that they relied on the false or misleading information defendants provided, or what significance they attributed to that information." Defendant did not object to this instruction before the trial court or challenge it in any way before either this Court or the Court of Appeals, and we express no opinion concerning its correctness. Similarly, defendant has not argued before this Court that his new trial motion should have been allowed or that he is otherwise entitled to relief because plaintiffs knew or should have known of the "true facts" or that plaintiffs did not or should not have reasonably relied upon defendant's representations. "The scope of review on appeal is limited to issues so presented in the several briefs." N.C. R. App. P. 28(a).

617, 99 S.E.2d 805, 805-06 (1957) (per curiam); then citing *Roberts v. Hill*, 240 N.C. 373, 380, 82 S.E.2d 373, 380 (1954); and then citing *Pruitt v. Ray*, 230 N.C. 322, 322-23, 52 S.E.2d 876, 876-77 (1949) (per curiam)).  Inconsistent verdicts in the same actions may constitute grounds for awarding a new trial.  *See, e.g., Porter v. W. N.C. R.R. Co.*, 97 N.C. 66, 73-75, 2 S.E. 580, 583-85 (1887) (ordering a new trial when the jury's answer to one question indicated that the plaintiff did not negligently contribute to the accident that led to his death while its answer to another question indicated that the same plaintiff was contributorily negligent).  As defendant candidly concedes, the decision concerning whether to grant a new trial on the basis of allegedly inconsistent verdicts is one of discretion rather than one of law.  For that reason, our review of defendant's challenge to the denial of his motion for a new trial on the grounds that the jury's verdicts were impermissibly inconsistent "is strictly limited to the determination of whether the record affirmatively demonstrates a manifest abuse of discretion by the judge."  *Worthington v. Bynum*, 305 N.C. 478, 482, 290 S.E.2d 599, 602 (1982) (citations omitted).  An abuse of discretion has occurred when a trial court's discretionary decision was "manifestly unsupported by reason"; for that reason, such a discretionary decision will not be overturned on appeal absent "a showing that it was so arbitrary that it could not have been the result of a reasoned decision."  *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).

The prior decisions of this Court suggest that jury verdicts should not be set aside for inconsistency lightly.  For example, we have stated "that a verdict should be

liberally and favorably construed with a view of sustaining it, if possible." *Guy v. Gould*, 202 N.C. 727, 729, 164 S.E. 120, 121 (1932).[4] Our authority to overturn a trial court's discretionary decision to grant or deny a new trial motion should be exercised "with *great care and exceeding reluctance*," *In re Will of Buck*, 350 N.C. 621, 626, 516 S.E.2d 858, 861 (1999), given our "great faith and confidence in the ability of our trial judges to make the right decision, fairly and without partiality, regarding the necessity for a new trial" in light of "their active participation in the trial, their first-hand acquaintance with the evidence presented, their observances of the parties, the witnesses, the jurors and the attorneys involved," *Worthington*, 305 N.C. at 487, 290 S.E.2d at 605, and our belief that "the exercise of this discretion sets aside a jury verdict and, therefore, will always have some tendency to diminish the fundamental right to trial by jury in civil cases which is guaranteed by our Constitution." *In re Buck*, 350 N.C. at 626, 516 S.E.2d at 861. As a result, the relevant issue is not whether we would have made the same decision that the trial court made in ruling upon defendant's new trial motion; whether we would have made different credibility determinations, viewed the evidence differently, or reached a different result than the jury, or whether there was other evidence upon which the jury could have relied in resolving the liability issues submitted for its decision in this case; instead, the

---

[4] Similarly, we have also determined that, "[w]hen a judgment has been entered on seemingly inconsistent findings of fact, it is the duty of the reviewing court to reconcile the findings and uphold the judgment if practicable." *Davis v. Ludlum*, 255 N.C. 663, 666, 122 S.E.2d 500, 502 (1961) (citing *Bradham v. Robinson*, 236 N.C. 589, 593, 73 S.E.2d 555, 558 (1952)).

issue before us is whether the trial court had a rational basis for determining that a reasonable jury could have reached different decisions with respect to the issue of whether defendant and Mr. Rice made false and misleading representations to plaintiffs. A careful review of the record in light of the very deferential standard of review applicable in this case satisfies us that the trial court did not abuse its discretion by denying defendant's motion for a new trial.

### 1. Statements to Piazza

On 30 April 2010, defendant sent the following e-mail to Dr. Piazza and a number of other recipients:

> Guys John Cummings just had a meeting in NY with Verizon. We need $100K - $200K ASAP, in 3-4 weeks we go back to Verizon we have an opportunity to be their featured AR. Rob is going to send out a summary later today. I know all of you are BUSY!!! I need you to give a few minutes to look at this potential. THANK YOU for your TRUST!!
>
> Greg
>
> John Cummings 919 601 9090 Rob Rice 919 802 5257

Dr. Piazza "became aware of the Verizon opportunity" when he received this e-mail. A few hours later, Mr. Rice sent the following e-mail to defendant and the recipients of defendant's earlier communication, including Dr. Piazza:

> Gentlemen,
>
> John Cummings met with McGarry Bowen (NY Marketing Agency) and the director of new technologies at Verizon (I

believe that was his title) this afternoon in New York. John can give you more details directly.

John basically laid out our strategy of "meeting consumer demand by providing the first social media marketplace that enables people to buy, sell, and trade virtual goods for use in mobile and augmented reality. Mirascape allows consumers to create and sell their own augmented reality content and experiences for a profit." This is important because it dramatically distinguishes us from other startups in the industry that are more focused on directory AR, single-user experiences, or marketing gimmicks for the PC.

He described our short term approach with Allied Integrated Marketing to re-purpose QR codes and turn traditional media into trigger/activation points for the delivery of media, as well as the early phase of virtual goods (dynamically linked and collectible). The next step is the earthmarks, which allow users to upload all media types to specific locations, share them with each other, interact, and build influence and reputation. The next stage of this is letting users link earthmarks and 3D media together in waypoints, which allows for drag and drop creation of treasure hunts, tour guides, and all sorts of engaging promotions and experiences.

Verizon responded extremely well to this and asked how we differentiate ourselves from others like Layar. The answer, simply put, is that we are focusing on empowering the user to create content, as well as building a vibrant virtual goods marketplace, again centered on the user. Our model is based on microtransactions and data (where I believe the real value of this emerging industry is), while others are focusing more on custom channels or layers that do not support social very well or are lacking the virtual goods. Layar may have a content store going live, letting people sell access to custom layars ("show me the nearest subway"), but we are the first launching a virtual goods marketplace (tapping into one of the newest and fastest growing multi-billion dollar markets).

-14-

While we have been seeking $200k in additional angel funding to meet our milestones and deliverables (June for Allied and July for a public beta launch), we now have an opportunity to go back to Verizon in about three weeks to blow their minds with a demo that shows everything we are doing with Allied, as well as all of the earthmark stuff (and some of the early social marketplace functionality). The opportunity here is to become the featured AR application for Verizon, OEM'd[5] on all of the DROID smartmobiles, and leverage their marketing. Even bigger, if we can pull this off with Verizon, it puts us squarely in the limelight of catching the eyes of other Fortune 100 companies for marketing, promotions, and strategic partnerships.

The challenge here, is that we have to jump to warp speed to accelerate development . . . not only to meet our milestones, but to WOW Verizon. This is a one-shot opportunity. As things currently are, we are crawling along to meeting the milestones, but there is no way we can deliver the perfect demo for Verizon without immediate funding. I need resources to bring on additional developers as a strike team to do this fast, hard, and well. Not only do we need to take the app and the website to the next level, but we need to make it look fantastic, as well as the actual demo/presentation . . . . This is a huge chance and opportunity, but we can't do it alone. We need help finding additional angel capital that can make a decision and move quickly.

We need $200k. That's four people at $50k. I know we can do this. We are perfectly positioned to take down some phenomenal strategic partnerships and deals (on top of what we already have done), launch on the market, blow every other AR company completely out of the water, and take the lead in this industry. Even beyond that, opportunities like this emerging industry only happen once

---

[5] The term "OEM" means that the application or software is a default application pre-installed on the smartphone.

a decade or so . . . unless something major happens in biotech or nanotechnology, I don't see any other world-changing technologies coming of age any time soon. Mobile, Social, Local, Virtual is the magical convergence that we are deep in the middle of with augmented reality and Mirascape.

I've attached an updated version of our pitch deck that has some new info in it for those of you that haven't seen one recently.

As usual, please feel free to call or email me at any time with any questions.  Thank you for everything you have done for us so far.

Best regards,

Robert Rice
CEO Neogence Enterprises

As an initial matter, we believe that the Court of Appeals' emphasis upon the extent to which defendant and Mr. Rice took reasonable care to avoid making materially false or misleading statements to Dr. Piazza, which was the subject of the second issue that the trial court submitted for the jury's consideration with respect to each defendant, as a justification for the trial court's failure to treat the jury's verdicts as impermissibly inconsistent overlooks the fact that the jury found against defendant and in favor of Mr. Rice on the basis of the "materially false and misleading statement" issue rather than on the basis of the "reasonable care" issue.  The fact that the record would support differing treatment of defendant and Mr. Rice with respect to the "reasonable care" issue simply sheds no light on the extent to which a reasonable jury could have found that defendant, but not Mr. Rice, made materially

false and misleading statements to plaintiffs. Thus, the Court of Appeals erred by upholding the trial court's decision to deny defendant's new trial motion on the grounds that defendant and Mr. Rice took differing levels of care to determine the accuracy of the statements that they made to Dr. Piazza. Instead, any determination of the extent, if any, to which the jury's verdicts with respect to the "materially false and misleading" statement issue were impermissibly inconsistent necessarily requires a careful examination of the statements that defendant and Mr. Rice made to Dr. Piazza and the circumstances under which those statements were made.

As defendant emphasizes, the e-mails that defendant and Mr. Rice sent to Dr. Piazza both indicate that Mirascape had an opportunity to become Verizon's featured, pre-loaded augmented reality application. On the other hand, the e-mail transmitted by Mr. Rice provided considerably more detail about the opportunity that had allegedly arisen from the McGarry Bowen meeting than the e-mail sent by defendant. Mr. Rice opened his e-mail by noting that Mr. Cummings had met with employees of McGarry Bowen and Verizon and that Mr. Cummings "can give you more details directly." Moreover, Mr. Rice provided specific details concerning the information that Mr. Cummings had presented at the meeting and noted that Neogence's work with Allied Integrated Marketing and the development of earthmarks had generated the most interest from the attendees. Although Mr. Rice did, as defendant notes, state that Mirascape could "become the featured AR application for Verizon, OEM'd on all of the DROID smartmobiles," he also mentioned the actual opportunity that

stemmed from the McGarry Bowen meeting, which was to "leverage [Verizon's] marketing." In addition, Mr. Rice stated that Neogence would first have to create a "demo" displaying "everything we are doing with Allied, as well as all of the earthmark stuff" before mentioning other milestones that Neogence had been working to achieve, including a public beta launch scheduled for July 2010, and noting that additional funding would be needed to complete both the Verizon presentation and achieve the other pre-existing goals. A trial judge could have reasonably determined that the jury, after studying these e-mails, had a rational basis for concluding that defendant's communication, which mentions only Verizon and the opportunity "to be their featured AR," was a materially false or misleading statement and that the substantial additional information contained in Mr. Rice's communication, coupled with his open invitation for the recipients to contact him if they had any questions, provided a sufficient basis to refrain from the making of such a determination concerning Mr. Rice's communication.

Our decision to uphold the Court of Appeals' decision with respect to the inconsistent verdict issue relating to Dr. Piazza is bolstered by information contained in Mr. Rice's trial testimony.[6] Among other things, Mr. Rice testified that:

> Q.    Okay. Just below this specific language, you then go on to say, "The opportunity here is to become the featured AR application for Verizon -- for Verizon OEMed on all the Droid smart mobiles and leverage their marketing." Are

---

[6] Unlike Mr. Rice, defendant did not testify at trial.

these three separate possibilities that you're discussing in regard to Verizon?

A.    I believe so.    I mean, this was kind of bundled together, but they were all possibilities.    They all have different advantages and disadvantages.

Q.    Well, how are they different?

A.    Well,   leveraging   somebody's   marketing,   for example, if I have ten dollars to go out and put up some posters that I printed on my laptop somewhere, that's only going [to] get me so far.   But if I have somebody, say, in a large  company  and  say,  hey,  we're  going  to  do  this  big campaign for a new car coming out for a new movie, and sure,  we'll  stick  your  logo  on  the  side  and  include  you, you're basically leveraging all of those dollars to get the exposure and kind of  the brand recognition, as opposed to what you would do on your own.   That's very different from something where you're, you know, being OEMed or pre-installed on a mobile device.   In that case, you're not getting the marketing exposure and attention, but you're getting distribution.   So you -- you're in front of a lot more people, and it's already in the hand.   If I see an ad on TV, I think oh, that's cool maybe I'll buy the burger or download the app.   But if it's already in my phone or in hand, I have it immediately.   People are much more likely to play and use it.    The  disadvantage  of  OEMing  is  what  people  call bloatware.

Q.    I'm sorry, what?

A.    Bloatware.   I don't know how many times I bought a computer or phone that had stuff on it I didn't want.   You know, TurboTax or Norton Antivirus, whatever tools.   So you have the advantage of more distribution, but there's also the risk that there may be some negative, you know, connotations that there's more crap on my phone and get rid of it. So there's different advantages and disadvantages depending on how it's structured.

A trial judge could have rationally determined that the jury had a reasonable basis for concluding that Mr. Rice's statement that Neogence might be able to "leverage their marketing" if Neogence was able to successfully demonstrate Mirascape at a subsequent meeting and his explanation of the benefits of "leveraging" McGarry Bowen's marketing efforts on behalf of Verizon, as compared to preloading Mirascape on Verizon phones, "significantly altered the total mix of available information" to a reasonable investor and justified a finding that Mr. Rice's statements, taken in context and as a whole, were not materially false and misleading, while the same could not be said for defendant's statements. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757, 766 (1976) (footnote omitted) (explaining that an omission is material in the event that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"); *Ehrenhaus v. Baker*, 216 N.C. App. 59, 88, 717 S.E.2d 9, 28-29 (2011) (adopting the standard for materiality set forth in *TSC Indus.*), *appeal dismissed and disc. rev. denied*, 366 N.C. 420, 735 S.E.2d 332 (2012). In other words, given that including Mirascape in McGarry Bowen's marketing efforts was the opportunity that was actually discussed at the McGarry Bowen meeting, Mr. Rice's reference to "leverag[ing] their marketing" in Mr. Rice's e-mail and his trial testimony concerning the potential value of that opportunity could have reasonably persuaded the jury that Mr. Rice's statement, as a whole, was not *materially* false or misleading, *see Latta v.*

*Rainey*, 202 N.C. App. 587, 599, 689 S.E.2d 898, 909 (2010) (stating that "[a] misrepresentation or omission is 'material' if, had it been known to the party, it would have influenced the party's judgment or decision to act" (quoting *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 75-76, 598 S.E.2d 396, 402, *disc. rev. denied,* 359 N.C. 67, 604 S.E.2d 310 (2004))), while defendant's failure to make a similar statement during his own communications with Dr. Piazza might have caused a reasonable jury to reach a contrary result.

Finally, Dr. Piazza testified that he spoke to defendant on the telephone approximately seventy times between 30 April 2010 and 2 June 2010. According to Dr. Piazza, these phone calls were "more often than not" placed by defendant and included discussions of

> the Verizon opportunity with me primarily . . . describ[ing] it consistently with his e-mail, that because of a meeting that John Cummings had in New York and McGarry Bowen, and an opportunity to have met with a Verizon executive for new technologies, that John had an opportunity to explain what was going on at Neogence and what we were doing with Mirascape, and was intrigued enough to invite John back to Verizon to present a demo, a demo App, an application. And if that were acceptable to Verizon, we had an opportunity to be OEMed or featured AR or pre-installed on every Verizon – Verizon Droid phone.

Although Mr. Rice communicated with Dr. Piazza by e-mail on several occasions concerning the opportunities that had been discussed at the McGarry Bowen meeting, the e-mails evidencing these communications were primarily focused upon the steps

that Neogence needed to take to prepare for the upcoming meeting with Verizon and to accomplish goals that the company had been working toward before the McGarry Bowen meeting.[7] We hold that the trial court had a rational basis for concluding that the jury could have reasonably determined that defendant, but not Mr. Rice, made materially false and misleading statements to Dr. Piazza based, at least in part, upon the frequency with which defendant and Mr. Rice told Dr. Piazza that there was a reasonable opportunity for Mirascape to be preloaded onto Verizon phones.

As a result, after carefully reviewing the record, we conclude that the jury heard evidence from which it could reasonably conclude that defendant made more direct, less nuanced, comments to Dr. Piazza concerning the extent to which Neogence had the opportunity to have Mirascape preloaded onto Verizon phones than Mr. Rice did; that defendant reiterated this contention to Dr. Piazza more frequently than Mr. Rice did; and that Mr. Rice's statements included more accurate descriptions of the opportunity that had become available to Neogence than those made by defendant. In light of this set of circumstances, we are unable to conclude that the trial court's decision to deny defendant's request for a new trial on the basis of allegedly inconsistent verdicts arising from the statements made to Dr. Piazza by defendant and Mr. Rice, respectively, was "so arbitrary that it could not have been the result of

---

[7] Although an examination of Dr. Piazza's cell phone bills indicated that he and Mr. Rice communicated via text message or telephone calls on several occasions between 2 May 2010 and 24 May 2010, the record does not contain any information concerning the nature and content of these communications.

a reasoned decision," *White*, 312 N.C. at 777, 324 S.E.2d at 833, or that the Court of Appeals erred by declining to set aside the trial court's decision to that effect. As a result, we hold that defendant's challenge to the Court of Appeals' decision to uphold the denial of his motion for a new trial on the grounds that the jury's verdicts concerning the relative liability of defendant and Mr. Rice to Dr. Piazza were impermissibly inconsistent lacks merit.

### 2. Statements to Lampuri

Mr. Lampuri did not receive the e-mails that defendant and Mr. Rice sent out on 30 April 2010. Instead, Mr. Lampuri first learned of the opportunity that had been discussed at the McGarry Bowen meeting on 25 May 2010, when Mr. Lampuri and his wife went to defendant's office for an obstetrical appointment. As he examined Ms. Lampuri, defendant

> proceeded to have a conversation with [Mr. Lampuri] about this exciting new opportunity that Neogence, his company had. . . . we've got something really exciting going on, our director of sales just got back from New York City at a meeting. There were Verizon executives there, and they were absolutely blown away by our technology that we needed – Neogence – excuse me, Neogence needed to go back, create this demo, come back and show Verizon, you know, what they've been talking about, what they've been showing about this technology and they're going [to] get OEMed. They're going pre-installed on all Verizon phones.

Similarly, Ms. Lampuri testified that defendant had stated during the medical appointment "that his company had an opportunity to be featured on Verizon phones directly installed on the phone."

Mr. Rice made statements to Mr. Lampuri concerning the opportunity that had arisen at the McGarry Bowen meeting during a conference at the Neogence headquarters in mid-July 2010 that was attended by Mr. Lampuri, Mr. Rice, Mr. Cummings, and Mr. Kirkbride. At that meeting, Mr. Cummings stated

> that he was in New York in a meeting with an advertising company, and that there were Verizon executives in the room. And they were, again, absolutely wowed by the technology, that we need – they needed to go back, create a demo, go back to Verizon in a couple weeks and if they – if they wowed Verizon, I like to say, then they have the opportunity to be preloaded, OEMed on all phones.

During the meeting, Mr. Rice said that "the deal was very much real," that "[i]t was a real opportunity," and that "the funds that they were seeking were to get this demo up and doing – up and coming to show Verizon." At another meeting held at the Neogence headquarters in early August, which Mr. Lampuri attended along with other members of his family, Mr. Cummings said "the exact same thing" that he had said at the prior meeting and Mr. Rice reiterated "that the deal was very much real."

Defendant contends that, given defendant's limited "interactions with [Mr.] Lampuri" and the fact that this interaction "did not occur near in time to [Mr.] Lampuri's actual investment in Neogence" and given that the two meetings in which Mr. Rice was involved occurred closer in time to the making of Mr. Lampuri's investment and that "the opportunity was described [to Mr. Lampuri] in similar terms as those presented by" defendant, the jury's verdicts that defendant, but not Mr. Rice, had made materially false and misleading statements to Mr. Lampuri were

impermissibly inconsistent. A careful review of the record reflects, however, that defendant and Mr. Rice made substantially different statements to Mr. Lampuri concerning the nature of the opportunity that had become available to Neogence during the McGarry Bowen meeting. Simply put, defendant told Mr. Lampuri that Neogence had the opportunity to be preloaded onto Verizon's phones while Mr. Rice never made any such statement. Although the jury could have determined that Mr. Rice's statements during the meetings at which Mr. Lampuri was in attendance that "the deal was very much real" constituted a reference to the same opportunity that was described by Mr. Cummings during those meetings and by defendant during Ms. Lampuri's medical appointment, a reasonable jury could have also interpreted this statement in a different manner.[8] As a result of the fact that the record discloses ample justification for a jury decision to treat defendant and Mr. Rice differently with respect to the issue of whether either of them had made materially false and misleading statements to Dr. Piazza and Mr. Lampuri, we hold that the Court of Appeals correctly determined that the trial court did not abuse its discretion by denying defendant's request for a new trial based upon the existence of allegedly

---

[8] The jury might have also deemed it significant that the parties had stipulated to the fact that, "[i]n mid-July 2010, [Mr.] Lampuri was invited to Neogence to preview a demonstration of Mirascape" at which Mr. "Cummings told [Mr.] Lampuri that Neogence had a chance for an opportunity with Mirascape to become an 'OEM' product for installation on Verizon smartphones based upon his prior meeting(s) and/or conversations with Verizon employees or agents" while entering into no similar stipulation concerning the statements that Mr. Rice made to Mr. Lampuri.

impermissible inconsistencies in the jury's verdicts with respect to the "materially false and misleading" statement issue.

## B. Safe Harbor Instruction

In his second challenge to the correctness of the Court of Appeals' decision, defendant contends that the trial court erred by failing to instruct the jury in accordance with N.C.G.S. § 55-8-30(b)(1),[9] which provides that a corporate director cannot be held liable "for any action taken as a director, or any failure to take any action," N.C.G.S. § 55-8-30(d), if he or she "rel[ies] on information, opinions, reports, or statements . . . prepared or presented by . . . [o]ne or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented." N.C.G.S. § 55-8-30(b)(1) (Supp. 2018). According to defendant, the Court of Appeals should have construed the reasonable care standard enunciated in N.C.G.S. § 55-8-30(a)(2) *in pari materia* with N.C.G.S. § 78A-56(a)(2) or applied the rule of lenity to determine that the "safe harbor" defense delineated in N.C.G.S. § 55-8-30(b) precludes a finding of liability based upon the making of allegedly false and misleading statements pursuant to N.C.G.S. § 78A-56(a)(2), citing, *inter alia, Meza v. Division of Social Services*, 364 N.C. 61, 66, 692 S.E.2d 96, 100 (2010) (reading the language of N.C.G.S. § 108A–79(k) *in pari materia* with Article 4 of the Administrative Procedure Act); *Dellastatious v. Williams*, 242 F.3d 191, 195

---

[9] Defendant has not advanced any argument in reliance upon the common law business judgment rule in the proceedings before this Court.

(4th Cir. 2001) (relying upon provisions of Virginia's corporate governance statutes in determining whether the defendants used reasonable care to prevent a state law securities violation); and *Vogel v. Reed Supply Co.*, 277 N.C. 119, 131, 177 S.E.2d 273, 281 (1970) (applying the rule of lenity in a civil case when construing a statute that potentially imposed civil and criminal liability). In view of the fact that defendant was a Neogence director who claimed to have merely repeated information that he had received from Mr. Cummings and that he reasonably believed Mr. Cummings to be reliable and competent, defendant argues that the Court of Appeals erred by holding that he was not entitled to have the jury instructed concerning the "safe harbor" provisions of N.C.G.S. § 55-8-30. Plaintiffs, on the other hand, argue that defendant agreed to the trial court's instruction concerning the circumstances under which he could be held liable pursuant N.C.G.S. § 78A-56(a)(2) and never properly requested delivery of the "director safe harbor" instruction to which he now claims to have been entitled.

"This Court has long held that '[w]hen charging the jury in a civil case it is the duty of the trial court to explain the law and to apply it to the evidence on the substantial issues of the action.'" *Yancey v. Lea*, 354 N.C. 48, 52, 550 S.E.2d 155, 157 (2001) (alteration in original) (first quoting *Cockrell v. Cromartie Transp. Co.*, 295 N.C. 444, 449, 245 S.E.2d 497, 500 (1978); then citing *Superior Foods, Inc. v. Harris-Teeter Super Mkts., Inc.*, 288 N.C. 213, 218, 217 S.E.2d 566, 571 (1975); and then citing *Inv. Props. of Asheville, Inc. v. Norburn*, 281 N.C. 191, 197, 188 S.E.2d 342, 346

(1972)).[10] As a result, "[i]f a party contends that certain acts or omissions constitute a claim for relief or a defense against another, the trial court must submit the issue with appropriate instructions if there is evidence which, when viewed in the light most favorable to the proponent, will support a reasonable inference of each essential element of the claim or defense asserted." *Cockrell*, 295 N.C. at 449, 245 S.E.2d at 500 (first citing *Vernon v. Crist*, 291 N.C. 646, 231 S.E.2d 591 (1977); and then citing *Atkins v. Moye*, 277 N.C. 179, 176 S.E.2d 789 (1970)).

On the other hand, "[r]equests for special instructions must be in writing, entitled in the cause, and signed by the counsel or party submitting them." N.C.G.S. § 1A-1, Rule 51(b) (2017); *see also Hanks v. Nationwide Mut. Fire Ins. Co.*, 47 N.C. App. 393, 404, 267 S.E.2d 409, 415 (1980) (citing *King v. Powell*, 252 N.C. 506, 512, 114 S.E.2d 265, 269-70 (1960), and stating that "[i]t is the duty of the party desiring instructions on a subordinate feature of the case or greater elaboration on a particular point to aptly tender request for special instructions"). In the event that a party fails to "comply with the requirements of [N.C.G.S. § 1A-1,] Rule 51(b), the trial court act[s] properly within its discretion in denying the request." *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 379, 542 S.E.2d 689, 694 (2001) (citing *Hord v. Atkinson*, 68 N.C. App. 346, 351, 315 S.E.2d 339, 342 (1984) (holding that the trial court could properly refuse to instruct the jury concerning its right to consider the

---

[10] "To the extent these cases suggest the court must apply the law to the evidence, they have been overruled by the 1985 amendments to [N.C.G.S. § 1A-1,] Rule 51." 2 G. Gray Wilson, *North Carolina Civil Procedure* § 51-3, at 51-8 n.52 (3d ed. 2007).

physical evidence in a motor vehicle negligence case on the grounds that "the plaintiff's request went beyond the trial judge's general duty of explaining the law arising on the evidence with respect to the substantial features of the case" and that, with respect to this "subordinate feature," "the plaintiff did not comply with the requirements of Rule 51(b)")); *see also Koutsis v. Waddel*, 10 N.C. App. 731, 733-34, 179 S.E.2d 797, 799 (1971) (stating that, "[w]here the court adequately charges the law on every material aspect of the case arising on the evidence," "the charge is sufficient and will not be held error for failure of the court to give instructions on subordinate features of the case, since it is the duty of a party desiring instructions on a subordinate feature, or greater elaboration, to aptly tender a request therefor" (quoting 7 Strong's North Carolina Index 2d: *Trial* § 33, at 329 (1968) (footnotes omitted))).  Assuming that a proper "request is made for a specific instruction, correct in itself and supported by evidence, the trial court, while not obliged to adopt the precise language of the prayer, is nevertheless required to give the instruction, in substance at least," with "the failure [to do so] constitut[ing] reversible error." *Minor v. Minor*, 366 N.C. 526, 531, 742 S.E.2d 790, 793 (2013) (first quoting *Calhoun v. State Highway & Pub. Works Comm'n*, 208 N.C. 424, 426, 181 S.E.2d 271, 272 (1935); then citing *State v. Davis*, 291 N.C. 1, 13-14, 229 S.E.2d 285, 293-94 (1976); and then citing *Bass v. Hocutt*, 221 N.C. 218, 219-20, 19 S.E.2d 871, 872 (1942)).

The only written request for instructions that defendant submitted for the trial court's consideration that was at all relevant to the "safe harbor" issue consisted of a

verbatim recitation of N.C.P.I. Civil 807.50, a pattern jury instruction intended for use in cases in which a director is sought to be held liable for breach of his or her duty to the corporation and which provides that:

> The (*state number*) issue reads:
>
> "Was the plaintiff damaged by the failure of the defendant to discharge *his* duties as a corporate director?"
>
> On this issue the burden of proof is on the plaintiff. This means that the plaintiff must prove, by the greater weight of the evidence, four things:
>
> First, that the defendant failed to act in good faith. Good faith requires a director to discharge *his* duties honestly, conscientiously, fairly and with undivided loyalty to the corporation. Errors in judgment alone do not constitute a failure to act in good faith; however, unless a director honestly believes *he* is making a reasonable business decision, *he* fails to act in good faith.
>
> Second, that the defendant failed to act as an ordinarily prudent person in a like position would have acted under similar circumstances. (Unless *he* has actual knowledge to the contrary, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by
>
> > [one or more employees of the corporation who the director reasonably believes to be reliable and competent in the matter(s) presented]
> >
> > [[a lawyer] [a public accountant] [*name other outside advisor*] as to the matter(s) the director reasonably believes are within such [professional's] [advisor's] competence]

[a committee of the board of directors of which the director is not a member if *he* reasonably believes the committee merits confidence].)

Third, that the defendant failed to act in a manner *he* reasonably believed to be in the best interests of the corporation.

And Fourth, that the defendant's [acts] [omissions] proximately caused damage to the plaintiff. Proximate cause is a cause which in a natural and continuous sequence produces a person's damage and is a cause which a reasonable and prudent person could have foreseen would probably produce such damage or some similar injurious result. There may be more than one proximate cause of damage. Therefore, the plaintiff need not prove that the defendant's acts were the sole proximate cause of the damage. The plaintiff must prove, by the greater weight of the evidence, only that the defendant's acts were a proximate cause.

Finally, as to the (*state number*) issue on which the plaintiff has the burden of proof, if you find by the greater weight of the evidence that the plaintiff was damaged by the failure of the defendant to discharge *his* duties as a corporate director, then it would be your duty to answer this issue "Yes" in favor of the plaintiff.

If, on the other hand, you fail to so find, then it would be your duty to answer this issue "No" in favor of the defendant.

(Footnotes omitted.) The parties discussed whether the trial court should instruct

the jury in accordance with defendant's request at length during the jury instruction

conference.

When the "safe harbor" defense initially came up for discussion, defendant's

trial counsel argued that N.C.G.S. § 55-8-30 "trumps, if you will, [N.C.G.S. § 78A-

56(c)] and that [N.C.G.S. § 78A-56(c)] dovetails back to it" because "(c) is saying that" "our duty is to ensure that they acted reasonably in their capacities and so forth." In view of the fact that "there are no pattern instructions on this," defendant's trial counsel stated that he "simply went back to the breach of corporate duties with respect to [N.C.G.S. §] 55-8-30, and this is the pattern jury instruction that came from that" and "needs to be inserted."

After noting that N.C.G.S. § 78A-56 "specifically is dealing with the sale of securities as opposed to just your general obligations as a director of a corporation," the trial court asked defendant's trial counsel "[w]hy does [Chapter] 55 [of the North Carolina General Statutes] apply to this at all?" In response, defendant's trial counsel stated that, "of course, the allegation is" "a breach of [N.C.G.S. § 78A-56(a)(2)]," which "talks about so long as the defendants sustain the burden of proving that their actions were reasonable and so forth," with N.C.G.S. § 78A-56(c) "specifically talk[ing] about directors being responsible" "for these kinds of sales activity" unless the director was "riding herd over and making sure [sales employees] didn't do something they weren't supposed to do." According to defendant's trial counsel, directors would not be liable as long as "they conduct themselves in the manner that a reasonable—a[n] ordinary care director should do," with N.C.G.S. § 55-8-30 being "where that is articulated."

At that point, the trial court interjected that "my reading of" N.C.G.S. § 55-8-30 "will place the burden [of] proof on the plaintiff," while his "reading of [Chapter

78A of the General Statutes] puts the burden of proof on you." In response, defendant's trial counsel stated that "[t]hen what we might need to do is" provide "something [to] read to the jury members that talks about that burden and the fact that these defendants would be relieved from this offense if [ ] they acted accordingly" and that "if [N.C.P.I. Civil] 807.50 imposes too harsh, perhaps we can craft something." When the trial court pointed out that defendant's proposed liability-related special instructions appeared to be an "accurate statement of the law as far as the defenses available to [defendant] under" N.C.G.S. § 78A-56(a)(2) are concerned "[b]ecause it accurately states that the burden of proof is on you," defendant's trial counsel said "[r]ight"; noted that he "was just trying to get an option that the jury says, okay, we find that they carry that burden of proof; therefore we can't find them culpable"; and added that "I'm certainly in agreement with you relative to the statute and the reliance issues, but on the other hand, relative to the defenses of reasonable behavior and the fact that they're corporate directors, it certainly is my opinion that they get off if that's the—if that turns out to be the case."

After agreeing that defendants "get off" "if they sustained their burden of proof that they did not know, and in the exercise of reasonable care could not have known, of the untruth or omission," plaintiffs' counsel argued that the jury simply needed "those two elements" and suggested that "we give them one sentence of what it means to exercise reasonable care" from N.C.P.I. Civil 800.10, which addresses the tort of negligent misrepresentation. Once defendant's trial counsel had agreed that a

definition of "reasonable care" would be appropriate "because that is the standard that is in" N.C.G.S. § 55-8-30, the trial court "rule[d] that [defendants] have the burden of proof on that issue" and agreed with plaintiffs' counsel that the appropriate language would be: "First, the defendant did not know of the untruth or omission in offering or sale of a security to the plaintiffs; or, second" "that the defendant in the exercise of reasonable care could not have known of the untruth or omission." At that point, the trial court and counsel for the parties discussed the wording of the issues to be submitted to the jury, with defendant's trial counsel agreeing with the wording of the "reasonable care" issue and with the placement of the burden of proof with respect to that issue upon defendants as proposed by the trial court and plaintiffs' counsel. At the conclusion of the day's proceedings, the trial court agreed to prepare a set of draft instructions and to provide them to counsel for both parties on the understanding that "we'll have a brief hearing Monday morning" and "get that hammered out" so "you'll know what the instructions are before you make your closings."

At the time that the proceedings convened on the following Monday, the trial court afforded defendant's trial counsel an opportunity "to put [his] objections [ ] on the record" before noting that "you have submitted to the Court written requests for instructions and I have denied those." In response to the trial court's invitation, defendant's trial counsel stated that:

If Your Honor, please, the defendants have requested then in the instruction from the Court that pertains or arises out of Chapter 55 pertaining to members of the board of directors and the various responsibilities they have in performing their duties, and one of which that we specifically requested related to the fact that board of director members could rely upon statements that are made to them and they would, therefore, not be held responsible.

Let me find the particular reference so that I can state this accurately. And where this comes from is [N.C.G.S. §] 55-8[-]30, and the request that we had made was in regard to [N.C.G.S. §] 55-8[-]30(b)(1), suggesting that in discharging his duties, a director is entitled to rely on information, opinions, reports, or statements including in financial—including financial statements and other financial data if prepared by or presented by one or more officers of—or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented.

As I said to the Court, I think that [N.C.G.S. §] 55-8[-]30(c) is parallel to [N.C.G.S. §] 78[A]-56(c)(1) which then goes on to say the director is not entitled to the benefit of this section if he has actual knowledge concerning the matter in question that makes reliance otherwise permitted by [N.C.G.S. §] 55-8[-]30(b) unwarranted. And then of course what that would require is the same instructions that his Honor has anticipated which will be that—to instruct the jury that if the director himself had knowledge, actual knowledge, concerning the matter, then he would not enjoy the benefit of this particular provision of [N.C.G.S. §] 55-8[-]30(b)(1).

That is in essence, if Your Honor, please, what we had requested of the Court and it's our understanding that you have denied that previously. But again, we just simply want to put that on the record.

> I do not have, if Your Honor, please, a copy at this moment in time of the provisions, but I thought we had them the other day, but I have not filed them relative to the proposed jury instruction that I had crafted.

At the conclusion of this statement, the trial court noted that "you handed me up a pleading that was a proposed jury instruction, and feel free to file that until you find another copy" and ruled that "your request for jury instructions as well as your objections to the instructions are noted for the record and are denied." The trial court instructed the jury with respect to the "reasonable care" defense set out in N.C.G.S. § 78A-56(a)(2) that:

> The second issue[ ] reads: Did the defendant Gregory Brannon not know and in the exercise of reasonable care could not have known of the untruth or omission in his offer or sale of a security to the plaintiff Lawrence Piazza.
>
> On this issue, the burden of proof is on the defendant Gregory Brannon. This means that he must prove by the greater weight of the evidence two things:
>
> First, that the defendant Gregory Brannon did not know of the untruth or omission in the offering or sale of a security to the plaintiff Lawrence Piazza; and, second, that the defendant Gregory Brannon in the exercise of reasonable care could not have known of the untruth or omission in the offering or sale of a security to the plaintiff Lawrence Piazza.
>
> Reasonable care means that degree of care, knowledge, intelligence, or judgment which a prudent person would use under the same or similar circumstances. Thus, on this second issue on which the defendant Gregory Brannon bears the burden of proof, if you find by the greater weight of the evidence, first, that Gregory Brannon

did not know of the untruth or omission in the offering or sale of a security to the plaintiff Lawrence Piazza; and, second, that Gregory Brannon in the exercise of reasonable care could not have known of the untruth or omission in the offering or sale of a security to the plaintiff Lawrence Piazza, then it would be your duty to answer the second issue yes in favor of the defendant Gregory Brannon.

If on the other hand you find that the defendant Gregory Brannon has failed to prove each of these requirements by the greater weight of the evidence, then it would be your duty to answer this issue no in favor of the plaintiff Lawrence Piazza.[11]

Defendant's trial counsel did not lodge any additional objections when given an opportunity to do so at the conclusion of the trial court's instructions to the jury.

After carefully reviewing the record, we are not satisfied that defendant properly preserved his challenge to the trial court's refusal to give an explicit "safe harbor" instruction to the jury for purposes of appellate review. As an initial matter, we believe that the "safe harbor" defense, assuming, without deciding, that it is applicable to cases like this one,[12] was a subordinate feature of the present case given that N.C.G.S. § 78A-56(a)(2) absolves individuals alleged to have taken reasonable care from liability for the making of materially false and misleading statements and given that reasonable care could obviously include appropriate reliance upon

---

[11] The trial court delivered an essentially identical "reasonable care" instruction with respect to the issue of defendant's liability to Mr. Lampuri.

[12] We should not, of course, be understood as expressing any opinion concerning the extent to which the trial court would have erred had defendant submitted a proper written request for instructions concerning the director safe harbor issue for the trial court's consideration.

information supplied by other corporate officials. As this case was presented to the jury, the extent to which defendant was or was not acting as a director when he made the disputed statements to plaintiffs was not an essential element of plaintiffs' claims against defendant. Instead, both parties consented to the submission of this case to the jury on the implicit theory that the capacity in which defendant acted when he made the allegedly false and misleading statements was not relevant to the jury's liability-related decision. In light of that fact, the relevant issue was whether defendant was able to persuade the jury that "he did not know, and in the exercise of reasonable care could not have known, of the untruth or omissions," N.C.G.S. § 78A-56(a)(2), regardless of the capacity in which he was acting when he made the allegedly false statements to plaintiffs. The trial court discussed the "reasonable care" issue in detail in the instructions that were given to the jury, using both the relevant statutory language and additional language drawn from the pattern jury instruction relating to negligent misrepresentation claims, upon which the parties seemed to agree. Given that the trial court's instructions with respect to the "reasonable care" issue explained the nature of the decision that the jury was required to make and the basic legal principles that the jury was required to apply in deciding whether defendant should be absolved from liability on "reasonable care" grounds, we are persuaded that the requested "safe harbor" instruction, which would only become relevant if the jury made a separate determination that defendant was acting as a director at the time that he made the challenged statements to plaintiffs, involved a subordinate feature

of the case. As a result, unless defendant made an adequate written request for the delivery of a "safe harbor" instruction, the trial court did not err by omitting any reference to the "safe harbor" principles enunciated in N.C.G.S. § 55-8-30 from its instructions to the jury in this case.

Moreover, we are unable to conclude that defendant submitted an adequate written request for the delivery of a "safe harbor" instruction for the trial court's consideration. The written instruction that defendant submitted for the trial court's consideration contained a great deal of information that was totally irrelevant to the issues that were actually before the trial court and jury in this case. In addition, even if one overlooks the differing context that defendant's written request for instructions was intended to address and the extraneous material that it contained, defendant's proposed instruction placed the burden of proof upon plaintiffs rather than upon defendant even though defendant's trial counsel appears to have conceded (or at least did not explicitly object to the trial court court's determination) during the jury instruction conference that defendant, rather than plaintiffs, bore the burden of proof with respect to this issue. Moreover, defendant never appeared to acknowledge during the jury instruction conference that, for the "safe harbor" protection to be available to defendant, the jury would have had to make a preliminary determination that defendant was acting as a director, rather than in some other capacity, when he made the challenged statements to plaintiffs. As a result, for all of these reasons, we cannot conclude that defendant submitted a sufficiently accurate written request for

the delivery of a "safe harbor" instruction to properly preserve the issue of the trial

court's failure to deliver such an instruction to the jury for purposes of appellate

review.

Although defendant did attempt to clarify the nature of his request for the

delivery of a "safe harbor" instruction during the jury instruction conference, his

efforts in that regard do not suffice to overcome his failure to submit an adequate

written request for the trial court's consideration. Instead of submitting a written

request for instructions that excluded extraneous information, required the jury to

find that defendant was acting in his capacity as a director as a prerequisite for the

availability of the "safe harbor" defense, and accurately inserted the relevant "safe

harbor" language into the context of the "reasonable care" defense recognized by

N.C.G.S. § 78A-56(a)(2), defendant simply provided the trial court with a written

request for instructions that surrounded a limited amount of potentially relevant

information with a great deal of irrelevant information and placed the burden of proof

on plaintiffs despite defendant's trial counsel's apparent concession during the jury

instruction conference to the contrary during the jury instruction conference.

Although defendant's trial counsel attempted to orally explain how his requested

instruction could be modified to make it correct during the course of the charge

conference, he never submitted a proposed modification in writing. The entire

purpose of the written request requirement relating to subordinate features of the

case contained in N.C.G.S. § 1A-1, Rule 51(b) is to prevent trial judges from having

to do what defendant sought to have the trial court do in this case—create a new instruction based upon general language contained in a much more extensive instruction that needed to be changed in a number of significant ways. As a result, for all of these reasons, we hold that the trial court was entitled to reject defendant's request for the delivery of a "safe harbor" instruction to the jury on the grounds that defendant failed to submit a proper written request for such an instruction.

## C. Primary Liability and Scienter

Finally, defendant argues that he is entitled to a new trial on the grounds that the jury's verdict finding him liable to plaintiffs pursuant to N.C.G.S. § 78A-56(a)(2) is contrary to law given that a finding of liability under that statutory provision requires proof that he either owned the securities that plaintiffs purchased or acted with scienter when he solicited funds from plaintiffs for Neogence. In support of his argument, defendant relies upon the plain statutory language, which imposes liability upon a person who "[o]ffers or sells" that security by means of false or misleading statements. In defendant's view, allowing the imposition of liability under N.C.G.S. § 78A-56(a)(2) upon a non-owner would conflict with the language in which the statute is couched, including the provision requiring a successful plaintiff to tender the relevant security to the defendant as a precondition for recovering the purchase price. According to defendant, allowing recovery against a non-owner would be "nonsensical" given that a successful plaintiff would be required to tender the relevant security to a person from whom it was not procured.

In the event that plaintiffs sought to have defendant held liable for their Neogence-related losses, defendant contends that they should have proceeded against him pursuant to N.C.G.S. § 78A-8(2), which imposes liability on "any person, in connection with the offer, sale or purchase of any security, directly or indirectly," who made fraudulent representations upon which plaintiffs relied in deciding to invest in Neogence. In the alternative, defendant suggests that plaintiffs should have sought to have him held "secondarily liable" as a "control person" pursuant to N.C.G.S. § 78A-56(c), an approach that would have required plaintiffs to establish Neogence's "primary liability" pursuant to N.C.G.S. § 78A-56(a). Defendant believes that he "cannot be primarily liable under" N.C.G.S. § 78A-56(a)(2) in the absence of a determination that Neogence, "[t]he only person who could be primarily liable under the statute — and who could be a proper party to make good through the rescission required under Section 56(a)(2)," was primarily liable.

Finally, defendant contends that a finding that he was liable to plaintiffs pursuant to N.C.G.S. § 78A-56(a)(2) required a determination that he acted with scienter. Defendant reaches this conclusion by reference to decisions construing Section 12(2) of the Securities Act of 1933, upon which N.C.G.S. § 78A-56(a)(2) was based and which requires a finding that the defendant acted with scienter in offering or selling the securities in question, citing *Pinter v. Dahl*, 486 U.S. 622, 647, 108 S. Ct. 2063, 2078, 100 L. Ed. 2d 658, 682 (1988). Although defendant acknowledges that neither the United States Supreme Court nor this Court has definitively identified

the elements that had to be established for purposes of a claim asserted pursuant to either Section 12(2) of the Securities Act or N.C.G.S. § 78A-56(a)(2), he contends, in further reliance upon the rule of lenity, that "the jury should have been required to find that Dr. Brannon was either a securities owner *or* 'motivated at least in part by a desire to serve his own financial interests or those of the securities owner,' " citing *Pinter*, 486 U.S. at 647, 108 S. Ct. at 2078, 100 L. Ed. 2d at 658, and *State v. Williams*, 98 N.C. App. 274, 279, 390 S.E.2d 746, 749, *disc. rev. denied*, 327 N.C. 144, 394 S.E.2d 184 (1990), in support of this assertion.

In response, plaintiffs argue that defendant waived his right to advance this argument on appeal given that his trial "counsel requested the very instruction" of which he now complains and is now "complain[ing] of the action which he induced," quoting *Frugard v. Pritchard*, 338 N.C. 508, 512, 450 S.E.2d 744, 746 (1994). In addition, plaintiffs contend that, because defendant failed to raise this argument until after the trial had been completed, he is not entitled to advance it on appeal from the denial of his new trial motion given that N.C.G.S. § 1A-1, Rule 59(a)(8), limits a trial court's authority to award a new trial to situations involving "[e]rror in law occurring at the trial and objected to by the party making the motion"; that North Carolina Rule of Appellate Procedure 10(a)(1) provides that an issue is not properly preserved for purposes of appellate review absent "a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make" at trial; and that N.C. Rule App. P. 10(a)(2) prohibits a party from "mak[ing] any

portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires to consider its verdict, stating distinctly that to which objection is made and the grounds of the objection."

In response, defendant argues that, because the issue of whether he had failed to properly preserve his challenge to the trial court's primary liability instructions and failure to require a finding of scienter for purposes of appellate review was not mentioned in the dissenting opinion at the Court of Appeals or advanced in a petition seeking discretionary review of additional issues, plaintiffs' non-preservation argument is not properly before us.  In addition, defendant contends that the alleged error constitutes "a flaw that reaches beyond the instructions issued to the jury," "is a fundamental error," and is "simply inconsistent with the statutory scheme."  As a result, defendant contends that his challenge to the trial court's primary liability instruction and the trial court's failure to require a finding of scienter was properly advanced by means of a motion for a new trial in reliance upon N.C.G.S. § 1A-1, Rule 59(a)(7), which permits the trial court to award a new trial in the event that the jury's "verdict is contrary to law."

During the trial,[13] defendant submitted a written request for instructions in which he asked the trial court to instruct the jury that:

---

[13] We are not persuaded by defendant's argument that plaintiffs are not entitled to challenge the extent to which defendant is entitled to raise his primary liability and scienter claims for purposes of appellate review because defendant invited any error that the trial court may have committed or waived the right to argue that issue because it was not addressed in either the majority or dissenting opinions before the Court of Appeals.  In our

Issue 1 reads:  Did the Defendants, in soliciting the Plaintiffs to pay money for a security, make a statement which was materially false or misleading, or which under the circumstances was materially false or misleading because of the omission of other facts, where the Plaintiffs were unaware of the true or omitted facts?

. . . .

[A]s to this issue on which the Plaintiffs bear the burden of proof, if you find by the greater weight of the evidence:

First, that the Defendants made a statement to the Plaintiffs which was false or misleading, or which under the circumstances was false or misleading because of the omission of other facts;

Second, that the statement made by the Defendants, or the facts omitted by the Defendants, were material;

Third, that the Plaintiffs were unaware of the true or omitted facts prior to paying money for the security; and

Fourth, that the Defendants made such statement in connection with soliciting the Plaintiffs to pay money for a security,

then it would be your duty to answer this issue "Yes," in favor of the Plaintiffs.  If, on the other hand, you find that the Plaintiffs have failed to prove each of these

---

view, the extent to which an issue that is before us by means of a dissent or the allowance of a discretionary review or certiorari petition involves invited error or has been properly preserved for purposes of appellate review is inherently intertwined with defendant's related substantive claim, *In re R.L.C.*, 361 N.C. 287, 290-91, 643 S.E.2d 920, 921-22, *cert. denied*, 552 U.S. 1024, 128 S. Ct. 615, 169 L. Ed. 2d 396 (2007), and is, for that reason, not the sort of separate and independent substantive claim that the Court refused to consider in *North Carolina School Boards Ass'n v. Moore*, 359 N.C. 474, 506-07, 614 S.E.2d 504, 523-24 (2005). In view of this determination, plaintiffs' request for certiorari review of the issue of whether defendant invited any error that the trial court may have committed or properly preserved his primary liability and scienter claims for purposes of appellate review is dismissed as moot.

> requirements by the greater weight of the evidence, then it would be your duty to answer this issue "No," in favor of the Defendants.

During the charge conference, counsel for both sets of parties indicated that they had proposed identical instructions concerning the question of whether defendants had made false and misleading statements to plaintiffs. As a result, the trial court stated "[s]o we all agree that that's a good instruction as to 56(a)(2)" and instructed the jury concerning the issue of whether defendants had made false or misleading statements in violation of N.C.G.S. § 78A-56(a)(2) in accordance with the language that had been requested by the parties.

This Court has "consistently denied appellate review to [parties] who have attempted to assign error to the granting of their own requests." *State v. Wilkinson*, 344 N.C. 198, 213, 474 S.E.2d 375, 383 (1996); *see also State v. McPhail*, 329 N.C. 636, 643, 406 S.E.2d 591, 596 (1991) (stating that a litigant "will not be heard to complain of a jury instruction given in response to his own request" (citations omitted)).[14] Having urged the trial court to instruct the jury in exactly the manner that it instructed that body with respect to the "false and misleading" statement issue, defendant invited any erroneous finding of liability that might that have resulted from those instructions. *Frugard*, 338 N.C. at 512, 450 S.E.2d at 746 (stating

---

[14] The issue before the Court in *Justus v. Rosner*, 317 N.C. 818, 824-28, 821 S.E.2d 765, 769-72 (2018), was the appropriateness of the trial court's decision to grant a new trial on the grounds that the jury's verdict was contrary to the greater weight of the evidence pursuant to N.C.G.S. §1A-1, Rule 59(a)(7) rather than a challenge to the trial court's instructions to the jury.

that "[a] party may not complain of action which he induced"). As a result, defendant is not entitled to relief from the trial court's judgment and orders on the basis of his primary liability and scienter claims.[15]

### III. Conclusion

As a result, for all of the reasons stated above, we hold that the Court of Appeals did not err by affirming the challenged judgment and orders.[16] As a result, the Court of Appeals' decision, as modified in this opinion, is affirmed.

MODIFIED AND AFFIRMED.

Justices EARLS and DAVIS did not participate in the consideration or decision of this case.

---

[15] In light of our decision to refrain from reaching the merits of defendant's contentions that he could not be held liable to plaintiffs because he was not the seller of the securities in question, that defendant could not be held primarily liable to plaintiffs, and that defendant could not be held liable to plaintiffs in the absence of a finding of scienter, we express no opinion concerning the merits of any of these contentions.

[16] In view of the fact that defendant's challenge to the trial court's attorneys' fee award rested upon his contention that he was entitled to a new trial based upon the other alleged errors discussed in the text of this opinion and the fact that we have determined that defendant is not entitled to relief from the trial court's judgment and orders on the basis of those arguments, there is no need for us to discuss the attorneys' fee issue further in this opinion.

Justice NEWBY dissenting.

The majority's message to the business community is clear: Individuals serve as outside directors at their own peril! If a director makes an alleged misstatement to a potential investor, no matter how minute and regardless of whether the investor relied on it, the director may be personally liable. Today's decision eviscerates any protection for an outside director who uses information communicated by corporate officers to tell others of potential investment opportunities. In fact, the majority ratifies the outside director's liability, even though the corporate officers who made later-in-time statements were exonerated. While the majority's lengthy technical analysis may cloud its assault on fundamental business relationships, its ultimate result will decrease the number of people willing to serve as outside directors and severely limit start-up companies' access to angel investor capital.

Essentially, the majority holds that an outside director can be liable to an angel investor for repeating information he learned from corporate officers (1) even though the angel investor vetted the information through subsequent conversations with the corporate officers, and (2) the officers were absolved from liability for communicating the same information. Liability arises even though the investor does not rely on the alleged misstatement. To achieve this outcome, the majority withholds the director safe harbor protection that should be available to an outside director. The majority

wrongly expands potential liability under the securities fraud statute while shrinking any protection under the director safe harbor provision. In doing so, the majority exposes outside directors who identify potential investors, even those who are astute and experienced angel investors, to potential liability as "sellers" for purposes of the securities fraud statute. The liability extends here even though the outside director does not personally benefit directly from the sale, receiving neither funds from a direct sale of an interest nor a commission. Such an expansive reading could expose to liability anyone who discusses a potential investment opportunity with a friend. The majority wrongly holds that the securities fraud statute supplants director safe harbor protection. The majority's unwarranted analysis will have significant chilling effects in the business community.

Furthermore, the verdicts in this case are a miscarriage of justice because of their inconsistency regarding Rice, the Chief Executive Officer and director, and Brannon, the outside director. Brannon's representations to plaintiffs were not "materially" different from those of Rice. The majority's analysis diminishes the required "materiality" of an alleged misrepresentation to, in effect, any misrepresentation, no matter how "nuanced." The majority ignores the plain fact that, as experienced angel investors, plaintiffs thoroughly discussed the Verizon potential with the only person actually present at the meeting, Cummings, the director of sales. The evidence is uncontroverted that plaintiffs did not invest after communicating with Brannon but only after multiple conversations with Cummings

as well as Rice and Kirkbride, another corporate officer. Through these conversations, plaintiffs clarified the "true" nature of the Verizon opportunity. If Rice's statements to plaintiffs were accurate, then plaintiffs knew the "truth" about the opportunity before investing. Because of the dangerous removal of the director safe harbor protection and the miscarriage of justice arising from the inconsistent verdicts, I dissent.

## I. Relevant Facts

In 2007 defendants Rice and Kirkbride founded a technology start-up, Neogence, to develop graphical software, which could be loaded onto smartphones. Rice (the Chief Executive Officer and a director) and Kirkbride (an investor, director, the de facto Chief Financial Officer, a licensed attorney, and later the Chief Executive Officer) served as the initial board members. In 2009, as the corporation grew, Rice invited Brannon, an OB-GYN physician and investor, to join the Neogence board as an outside director.[1] Brannon had originally met Rice years before, and they had worked together on a prior venture. Kirkbride stated that Brannon was asked to serve on the board because of, *inter alia*, his "abilities on strategic directions," including obtaining "financing, investors, et cetera." Rice stated that Brannon "would make introductions to people that might have an interest in what [Neogence was]

---

[1] Generally, an "outside director" is "[a] nonemployee director with little or no direct interest in the corporation." *Director*, *Black's Law Dictionary* (10th ed. 2014).

doing." As Brannon characterized it, as a director he would "expos[e] this company to friends that may want to invest into it."

During Neogence's initial months as a start-up corporation, the board met informally and often. The company had elected to raise operating capital by issuing promissory notes, which were convertible to common stock. Neogence engaged legal counsel to draft the convertible notes and related documentation. Neogence, acting through its board of directors, then approached various "accredited" "angel investors"[2] to obtain funding. Each director helped identify and solicit investors throughout the ongoing fund-raising process.

In late 2009 Neogence hired John Cummings as an officer to serve as "director of sales." Cummings had worked for a company in which Brannon had previously invested, and they had become business acquaintances. Cummings's role "was focused on sales and business development."

In early 2010, during the process of raising capital and identifying investors, at Brannon's suggestion Rice reconnected with plaintiff Piazza, a previous investment partner from a prior venture, to discuss Neogence. In February 2010,

---

[2] An "angel investor" is "[a] person—usu[ally] an experienced and successful entrepreneur, professional, or entity—that provides start-up or growth financing to a promising company." *Investor*, *Black's Law Dictionary* (10th ed. 2014). In general, an "accredited investor" is a person with a minimum net worth of over $1,000,000 or annual income in excess of $200,000, 17 C.F.R. § 230.501(a)(5), (6) (2017), and is treated as "being knowledgeable and sophisticated about financial matters," *investor*, *Black's Law Dictionary* (10th ed. 2014). Herein an "accredited angel investor" is referred to as simply an "angel investor."

Piazza loaned Neogence $50,000 in exchange for two convertible promissory notes, convertible to Neogence stock at various points in time. Incorporated within the promissory notes executed by Piazza was a note purchase agreement, wherein Piazza represented that, *inter alia*, he "is an accredited investor," is "able to fend for [himself]," and "has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of [his] investments, and has the ability to bear the economic risks of [his] investments."[3] The purchase agreement and February promissory notes are signed by Rice as CEO of Neogence. Also in February 2010, Brannon introduced plaintiff Lampuri to Rice "as a potential investor."

The critical event, which led to this litigation, occurred on 30 April 2010 when Cummings informally met with a representative from Verizon, a national telecommunications company, and discussed Neogence's software technology and its development status. The meeting took place in New York at the offices of Verizon's marketing agency. The parties "brainstorm[ed]" about the possibility of including the Neogence software as a smartphone application for Verizon's upcoming summer campaign. The Verizon representative indicated that "if [the software] lived up to the things [Cummings] had presented in the meeting," and Neogence was "able to demonstrate it properly and functionally, that [Verizon's marketing agency] would

---

[3] The purchase agreement also discloses that the promissory notes and any underlying securities "have not been registered under the Securities Act of 1933" and that the sale and issuance of securities are "exempt" from such registration.

consider [the software] as part of their marketing for" certain smartphones and a "future potential business relationship" with Neogence.

Excited about this prospect, Cummings communicated the "Verizon opportunity" to Neogence board members Rice, Kirkbride, and Brannon, noting that if Neogence could "come back with a demo, . . . we would have a lot of possibilities of what we could do with the company and how great that that would be for Neogence. But the priority was to get the [software application] developed."

That same day, Brannon quickly e-mailed several people, including Piazza, copying Rice, stating:

> Guys   John Cummings just had a meeting in NY with Verizon.  We need $100K - $200K ASAP , [sic] in 3-4 weeks we go back to Verizon we have an oppurtnity [sic] to be their featured [software].  [*Rice*] *is going to send out a summary later today*.  I know all of you are BUSY!!!  I need you to give a few minutes to look at this potential.

(Emphasis added.)  As promised, Rice followed up with the more detailed e-mail that same evening, stating:

> Gentlemen,
>
> John Cummings met with [the marketing agency] and *the director of new technologies at Verizon* (I believe that was his title) this afternoon in New York.  *John can give you more details directly.*
>
> John basically laid out our [software] strategy of meeting consumer demand by providing the first social media marketplace that enables people to buy, sell, and trade virtual goods for use in mobile and augmented reality. . . .

6

. . . .

> Verizon responded extremely well to this and asked how
> we differentiate ourselves from others . . . . [W]e are the
> first launching a virtual goods marketplace (tapping into
> one of the newest and fastest growing multi-billion dollar
> markets).
>
> While we have been seeking $200k in additional angel
> funding to meet our [existing] milestones and deliverables
> . . . , we now have an opportunity to go back to Verizon in
> about three weeks to blow their minds with a demo that
> shows everything we are doing . . . . *The opportunity here
> is to become the featured [ ] application for Verizon*, OEM'd
> on [certain smartphones], and leverage their marketing.
> Even bigger, if we can pull this off with Verizon, it puts us
> squarely in the limelight of catching the eyes of other
> Fortune 100 companies for marketing, promotions, and
> strategic partnerships.
>
> The challenge here, is that we have to jump to warp speed
> to accelerate development . . . not only to meet our
> milestones, but to WOW Verizon. This is a one-shot
> opportunity. As things currently are, we are crawling
> along to meeting the milestones, but there is no way we can
> deliver the perfect demo for Verizon without immediate
> funding. . . . We need help finding additional angel capital
> that can make a decision and move quickly.
>
> We need $200k.

(Emphases added.) (Internal quotation marks omitted.)

On 1 May 2010, the next day, Piazza spoke by telephone directly with
Cummings, inquiring further about the details of his New York meeting and the
potential opportunity with Verizon. Cummings clarified that any opportunity with
Verizon was merely a possibility and that their "in" was through Verizon's marketing
agency. Piazza testified that during that phone conversation,

7

> [Cummings] was very excited that he had just gotten out of a meeting the day before, that he had held -- that was held at [Verizon's advertising agency], and he had met a Verizon executive of new technologies. And that -- that particular person was intrigued enough to invite him back to Verizon with an app, a demo app, such that, if they liked this we had an amazing opportunity to be on every Verizon Droid phone as a pre-installed application, OEMed, featured AR, I'm not sure.

Brannon was not a part of the call.

Beginning on 3 May, Rice sent a series of e-mails to Kirkbride, Brannon, Cummings, and Piazza specifying the technology development timeline and the need to have additional capital. On 25 May, Rice e-mailed Piazza saying,

> I'll do whatever it takes to get you on board. At this point, I can't move this company forward without you.
>
> Without you investing, right now, we are going to lose our momentum, development is going to stall, and we are likely going to lose some people that have to deal with economic realities of their own. If this does happen, I'll keep fighting and rebuild, but we will have lost our chance to be a player in the industry this year. . . . It will take me months to recover if we fall apart right now.
>
> On the other hand, if you invest now, you are effectively breathing new life back into the company, and empowering me (and us) to stop crawling along and start running the race. . . .
>
> I can do all of this with your investment this week and I can deliver. Granted some of the timelines and milestones have shifted, and will always continue to shift as we move forward. . . .
>
> You know I have been completely open and transparent with you from day one, even to my disadvantage in negotiating, and quite frankly we are at a crossroads right

> now. We need your investment, and we need it yesterday.
>
> Please believe in me and the team. We can't do this without you.

Afterwards, Rice told Kirkbride to "[d]o what you feel is necessary to close" Piazza.

On 26 May 2010, Cummings and Kirkbride flew to Maine to meet with Piazza and further discuss the "potential of" Neogence and to solicit his "interest in making an investment." Brannon was not present. After visiting with Cummings and Kirkbride and having talked with Rice, on 28 May Piazza loaned an additional $150,000 to Neogence in exchange for a convertible promissory note.

While Lampuri had met Rice and learned of Neogence in February 2010, he had not yet become an investor. Brannon told him in person of the potential Verizon opportunity on 25 May 2010. Thereafter, Lampuri met with Cummings who, along with Rice and Kirkbride, later met with Lampuri twice over the summer to discuss his loaning funds to Neogence and the potential for its "technology [to] be used in a number of different ways with a number of different brands," as well as the potential opportunity to present a demo to Verizon through its marketing agency. Lampuri testified that he

> was given a presentation that John Cummings was the lead on, and he discussed and reiterated basically what Greg [Brannon] had said, that he was in New York in a meeting with an advertising company, and that there were Verizon executives in the room. And they were, again, absolutely wowed by the technology, that we need -- they needed to go back, create a demo, go back to Verizon in a couple weeks and if they -- if they wowed Verizon, I like to

say, then they have the opportunity to be preloaded, OEMed on all phones.

When specifically asked, "How did what John Cummings told you at that meeting compare with what Dr. Brannon had told you on May 25th 2010 . . . ," Lampuri replied, "Essentially they were the exact same thing, very similar conversations," and "[b]oth had the same outcome that, you know, they met with a Verizon executive." Lampuri mentioned that in his conversation with Brannon "there was no word of advertising," but it was "essentially the exact same conversation." When asked during direct examination at trial what Rice contributed to discussions at the meeting, Lampuri testified that Rice "said the deal was very much real. It was a real opportunity, and the funds that they were seeking were to get this demo up and doing--up and coming to show Verizon." Lampuri left Cummings's presentations without making an investment.

Neogence missed its anticipated July deadline to demonstrate its software to the marketing agency and Verizon. Cummings rescheduled for "another 30, 60 days," ultimately for the fall of 2010. Again in August 2010, Lampuri met with Rice, Kirkbride, and Cummings at Neogence's headquarters. During those meetings, Lampuri alleges he was told that Neogence was preparing "to follow through on an opportunity Verizon had provided Neogence for Mirascape to become a featured AR application pre-installed on all Verizon DROID smartmobiles." Brannon did not attend any of these meetings.

Nonetheless, on 24 September 2010, well after the initial July deadline and months after his 25 May 2010 conversation with Brannon, and after having spoken with Cummings, Kirkbride, and Rice, Lampuri loaned Neogence $100,000 in exchange for a convertible promissory note. In that note purchase agreement, Lampuri, like Piazza, represented that he "is an accredited investor," is "able to fend for [himself]," and "has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of [his] investments, and has the ability to bear the economic risks of [his] investments." The purchase agreement is signed by Kirkbride as CEO of Neogence.

Neogence continued to miss deadlines. That fall, Cummings flew to New York again to meet with Verizon and its advertising agency to present the software technology, but Cummings "had to cancel the meeting while in front of the [office] building because" the software "would not function" on his smartphone. Ultimately, Neogence failed to create a functioning demo of its software.

Neogence went into a decline and was "having a very difficult time raising funds." Nonetheless, plaintiffs, as well as Brannon, invested additional money in Neogence in 2011, well after any opportunity with Verizon had passed. By the summer of 2011, Neogence was past due on its rent. On 7 July 2011, counsel for Piazza sent a formal demand letter seeking repayment of Piazza's promissory notes, which had matured and were past due. Shortly thereafter, Neogence closed its doors and went out of business.

On 13 July 2011, plaintiff Piazza filed his complaint against the corporation, Neogence Enterprises, Inc., for breach of contract stemming from Neogence's failure to repay his promissory notes upon their reaching maturity, seeking return of principal plus accrued interest. Piazza obtained a default judgment.

On 10 October 2012, plaintiffs filed their complaint against defendant officers and directors, Kirkbride, Rice, and Brannon, personally, for, *inter alia*, "securities fraud" under the North Carolina Securities Act, seeking money damages for the selling of a security by means of any untrue statement of a material fact or any omission.[4] These claims were based on alleged misrepresentations made by defendants to plaintiffs arising from the 30 April 2010 meeting between Cummings and Verizon. Specifically, plaintiffs complained

> [t]he representations made by Brannon, Rice, and Kirkbride to both Piazza and Lampuri regarding the opportunity for Mirascape to become a featured AR application pre-installed on all Verizon DRIOD smartphones were false and misleading. At no time did any person associated with Verizon ever discuss with John Cummings or any other Neogence officer, director, or employee any opportunity for Mirascape or Neogence technology to become a featured AR application pre-installed on all—or any—Verizon DRIOD smartphones.

Plaintiffs directed their allegations of fraudulent misrepresentation at defendants as a group; plaintiffs did not differentiate regarding the alleged misrepresentations by

---

[4] Plaintiffs voluntarily dismissed without prejudice their other claims against all defendants for common law fraud, negligent misrepresentation, and unfair and deceptive trade practices.

any individual defendant. Cummings, who was the director of sales, was not a named defendant in the complaint even though he was the only Neogence officer at the 30 April 2010 meeting, had communicated about the meeting with the directors, and had discussed the meeting and the potential opportunity in detail with both plaintiffs before either plaintiff invested in the company.

Despite having spoken directly and at length with Cummings regarding the possible opportunity with Verizon, and despite having invested money in Neogence well after it had lost that opportunity, plaintiffs asserted that they would not have loaned money to Neogence but for defendant directors' "false and misleading" representations, namely that the Neogence software potentially could "become a featured [ ] application pre-installed on all Verizon [ ] smartphones." Plaintiffs stated that "[a]t all relevant times material to this action, Kirkbride, Brannon, and Rice served on Neogence's board of directors."

Brannon unsuccessfully moved to dismiss plaintiffs' claims under Civil Procedure Rule 12(b)(6) based on plaintiffs' representations in their promissory note purchase agreements attesting to their ability to independently evaluate "the merits and risks" of their investments "through simple inquiries" beforehand. Brannon answered that, in his capacity as a director, he was entitled to rely on the statements and representations made to the board by the director of sales, Cummings. Specifically, Brannon answered that "[i]f the Plaintiff Piazza relied upon any misrepresentations made by Neogence directors or officials, he would have relied

upon what was told to him by Kirkbride or Cummings on or about May 26, 2010," the date of the Maine solicitation meeting, just two days before Piazza loaned an additional $150,000 to Neogence. As to Lampuri's claims, Brannon answered that when he

> spoke with Lampuri, he stated, based upon what Cummings reported to the Neogence board members, that Neogence had an opportunity of becoming a featured AR application with Verizon, but the conversation was broader and [he] also advised Lampuri that a prototype or demo of the software had to be created and a presentation would need to be made to have the chan[ce] to have an "opportunity" fulfilled . . . .

Before trial Kirkbride moved for summary judgment in his favor as a matter of law, arguing

> (1) the alleged representations of Kirkbride were true; (2) the statements allegedly made were too contingent and vague to be a material misrepresentation of a past or existing fact or reasonably relied upon; (3) Plaintiffs failed to make the required showing of a reasonable inquiry necessary to show reasonable reliance; and (4) Mr. Kirkbride did nothing but rely on Mr. Cummings in repeating Mr. Cummings' statements.

Likewise, Rice and Brannon moved for summary judgment, similarly arguing that the representations made were "literally true":

> 1. Plaintiff Piazza was equally or possibly a more sophisticated investor than was either of the Defendants and hence he could not have reasonably relied upon either of them; Plaintiff Lampuri invested long after the "opportunity with Verizon" complained of was an immediate and/or achievable goal and hence his reliance upon either of the Defendants with respect to emails months before his investment is unreasonable as a matter

14

of law.

2. Further, the representations allegedly made by [Cummings, Kirkbride, Brannon, and Rice] were literally true and insufficiently definite to be false or reasonably relied upon as a matter of law.

3. There were no legally material misrepresentations of fact made by either Defendant to the Plaintiffs.

4. Plaintiffs failed to make any reasonable inquiry or perform even minimal due diligence as to the basis or meaning of any alleged representations made to them prior to investing in Neogence.

On 25 November 2013, the trial court found no genuine issue of material fact with regard to plaintiffs' claim of securities fraud against Kirkbride and granted his motion for summary judgment but denied the motions of Rice and Brannon. The trial court did not give a specific reason for granting summary judgment for Kirkbride but denying it for Rice and Brannon. The claims against Rice and Brannon proceeded to trial.

At different stages of trial, Brannon moved to dismiss the claims against him based on an outside director's reliance upon representations of corporate officers (director safe harbor). The trial court denied the motions.

At the charge conference, counsel requested pattern instruction 807.50, noting that "this statute," N.C.G.S. § 55-8-30 and its protections referenced in Brannon's answer, "needs to be inserted" in the jury instructions. The protection, described as the "Director Safe Harbor," states:

(b)  In discharging *the duties of a director's office, a director is entitled to rely on information*, opinions, reports, or statements, including financial statements and other financial data, *if prepared or presented by* any of the following:

>    (1) *One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent* in the matters presented.

N.C.G.S. § 55-8-30(b)(1) (Supp. 2018) (emphases added).  Brannon included in his proposed jury instructions North Carolina Pattern Instruction Civil 807.50, titled "Breach of Duty-Corporate Director."  The proposed instruction included the following language:

"Was the plaintiff damaged by the failure of the defendant to discharge his duties as a corporate director?"

On this issue the burden of proof is on the plaintiff.  This means that the plaintiff must prove, by the greater weight of the evidence . . . :

. . . .

. . . that the defendant failed to act as an ordinarily prudent person in a like position would have acted under similar circumstances.  (Unless he has actual knowledge to the contrary, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by

[one or more employees of the corporation who the director reasonably believes to be reliable and competent in the matter(s) presented]

(Footnote call numbers and italics omitted.)  The trial court denied the proposed

instruction on the basis that the instruction wrongly placed the burden of proof on plaintiffs instead of Brannon, at which time Brannon's counsel suggested attempting to craft a different instruction. Apparently, no special instruction incorporating the director safe harbor protection was ultimately produced. Brannon reasserted his request for the pattern jury instructions regarding director safe harbor, N.C.G.S. § 55-8-30. The trial court denied the request.

The jury received four copies of the following issue to determine whether Rice and Brannon had made any misrepresentations to plaintiffs that would subject these defendants to individual liability under the securities fraud statute, N.C.G.S. § 78A-56(a)(2):

> Did Defendant, [name], in soliciting the Plaintiff, [name],
> to pay money for a security, make a statement which was
> materially false or misleading, or which under the
> circumstances was materially false or misleading because
> of the omission of other facts, where the Plaintiff, [name],
> was unaware of the true or omitted facts?

The trial court instructed the jury that, "[o]n this issue, the burden of proof is on the plaintiff." The trial court also instructed the jury to answer: "Did the defendant [Brannon] not know and in the exercise of reasonable care could not have known of the untruth or omission in his offer or sale of a security to the plaintiff [name]. On this issue, the burden of proof is on the defendant [Brannon]."

The jury found Brannon had made representations to both Piazza and Lampuri that were materially false or misleading and that plaintiffs were unaware of the true

17

facts but found that there was either no such misrepresentation on Rice's part or that plaintiffs were aware of the truth.[5]   Therefore, logically, the jury determined one of the following:   (1) Rice was truthful that Cummings met with a Verizon representative and discussed the "opportunity" for Neogence technology "to become the featured [ ] application for Verizon" smartphones, or (2) plaintiffs knew the meeting did not take place or the "opportunity" did not exist.

Thus Brannon, the outside director without technical expertise, was the only defendant held liable.  The jury found Brannon liable even though Rice, Kirkbride, and Cummings met with each plaintiff several times before either invested.  The trial court then adjudged that defendant was liable to Piazza for $150,000.00 plus prejudgment interest of $45,000.00, that Brannon was liable to Lampuri for $100,000.00 plus prejudgment interest of $27,333.33, and that plaintiffs could recover, jointly and severally, from Brannon $123,804.00 in attorneys' fees and $8,493.79 in court costs.

---

[5] If the jury found that either defendant had made materially false or misleading representations to either plaintiff, the jury was also asked to determine:  "Did the Defendant, [name], not know and in the exercise of reasonable care, could not have known of the untruth or omission in his offer or sale of a security to the Plaintiff, [name]?"  The jury answered no as to Brannon and each plaintiff, but it did not reach the question regarding Rice because it had not found that Rice made any statement which was materially false or misleading.

Brannon unsuccessfully moved for "judgment notwithstanding the verdict [JNOV] or in the alternative a new trial," arguing, *inter alia,* that the verdicts as to Rice and himself were inherently inconsistent given that

> Plaintiffs' evidence at trial tended to show that Defendant Brannon, an unpaid director, told Plaintiffs orally the same things that Defendant Robert Rice, a paid officer, communicated. The jury, however, found that the communicated information was a misrepresentation when communicated by Defendant Brannon, but was not a misrepresentation when communicated by Defendant Rice.

In the same motion, Brannon unsuccessfully argued that he, as a corporate director, "was entitled to rely on the information he received from John Cummings and repeated to plaintiffs as a matter of law under [the director safe harbor statute]" and that the trial court erred by instructing instead "on the general standard of reasonableness." Given that "[o]ne of the duties of a director is seeking capital investment in the company," Brannon argued he "requested and was entitled to an instruction under N.C.G.S. [§] 55-8-30(b)(1) and (b)(2)," the "specific safe harbor with respect to the discharge of a director's duty." According to Brannon, "[t]he uncontroverted evidence was that John Cummings was the only employee of Neogence . . . who had direct knowledge of the 'Verizon opportunity' and that defendants relied upon Mr. Cummings' statements regarding this opportunity." Brannon argued that sufficient evidence was presented to allow the jury to conclude that he "reasonably believed" Cummings "to be reliable and competent regarding the Verizon opportunity." The trial court denied the motion.

## II. Inconsistent Verdicts

The trial court abused its discretion by not granting a new trial because of inconsistent verdicts. "The trial judge has the discretionary power to set aside a verdict when, in his opinion, it would work injustice to let it stand; and, if no question of law or legal inference is involved in the motion, his action in so doing is not subject to review on appeal in the absence of a clear abuse of discretion." *Selph v. Selph*, 267 N.C. 635, 637, 148 S.E.2d 574, 575-76 (1966). Therefore, an appellate court will only disturb a trial court's order on a Rule 59 motion when the court "is reasonably convinced by the cold record that the trial judge's ruling probably amounted to a substantial miscarriage of justice." *In re Will of Buck*, 350 N.C. 621, 625, 516 S.E.2d 858, 861 (1999) (quoting *Anderson v. Hollifield*, 345 N.C. 480, 483, 480 S.E.2d 661, 663 (1997)). North Carolina Rule of Civil Procedure 59 designates "[a]ny irregularity by which any party was prevented from having a fair trial" as grounds for a new trial. N.C.G.S. § 1A-1, Rule 59(a)(1) (2017). For example, when a jury renders its verdicts, but "the answers to the issues are so contradictory as to invalidate the judgment, the practice of the Court is to grant a new trial, or *venire de novo*." *Palmer v. Jennette*, 227 N.C. 377, 379, 42 S.E.2d 345, 347 (1947) (citations omitted).

Both Brannon and Rice relied on the information they received from Cummings and both made the same substantive representations to Piazza and Lampuri regarding the Verizon opportunity. Moreover, both plaintiffs talked to Cummings multiple times *after* their conversations with Brannon, providing them

the opportunity to clarify any confusion. Neither plaintiff invested in the company until after he spoke with Cummings.

Under the securities fraud statute, the trial court instructed the jury that, to hold a defendant liable, it must find that (1) the defendant made "a statement which was materially false or misleading," and (2) the plaintiff was "unaware of the true or omitted facts." Only one person, Cummings, attended the meeting on 30 April 2010. Neither defendant Rice nor defendant Brannon was present. Both plaintiffs knew that Cummings was the only person at that meeting. Four people—Cummings, Rice, Kirkbride, and Brannon—knew what Cummings communicated to the directors about the meeting immediately after it occurred. The evidence indicates that Cummings, Rice, Kirkbride, and Brannon all communicated essentially the same message:

- A meeting occurred;

- a Verizon representative was present; and

- the Mirascape concept favorably impressed the Verizon representative, who was open to considering it further *if* Neogence could produce a working demo in a timely fashion.

The opportunity was time-sensitive, and, to meet the deadlines, the company needed more capital to afford additional technical staff. In sum, Cummings, Rice, Kirkbride, and Brannon all indicated that the potential opportunity was contingent on

21

producing a working demo quickly. Even with a working demo, the opportunity was still only a potential opportunity; nothing had been finalized with Verizon.

At trial Piazza, already an angel investor, testified that he first learned of the potential opportunity with Verizon through an e-mail sent by Brannon to him and others on 30 April 2010. Brannon copied Rice with the email. That e-mail stated, in pertinent part, "John Cummings just had a meeting in NY with Verizon. We need $100K - $200K ASAP , [sic] in 3-4 weeks we go back to Verizon we have an oppurtnity [sic] to be their featured [software]. [Rice] is going to send out a summary later today." Piazza summarized the relevant substance of Brannon's representations as Neogence's having an opportunity to present a demo to Verizon, "[a]nd if that were acceptable to Verizon," then there would be "an opportunity to be OEMed or featured AR or pre-installed on every Verizon -- Verizon Droid phone." As for his communications with Rice, Piazza testified that on the evening of 30 April 2010, he also received the forecast e-mail from Rice, which reiterated: "The opportunity here is to become the featured AR application for Verizon, OEM'd on all of the DROID smartmobiles, and leverage their marketing."

After receiving the e-mails from Brannon and Rice, Piazza immediately talked with Cummings about what had occurred at the 30 April 2010 meeting. Before investing on 28 May 2010, Piazza spoke directly with Cummings, communicated with Rice, and met in person with Cummings and Kirkbride to discuss the same Verizon opportunity first mentioned by Brannon in the 30 April 2010 e-mail. Even though

Cummings, Rice, Kirkbride, and Brannon communicated materially the same message to plaintiffs, interestingly, Cummings was not a named defendant here, and the trial court granted summary judgment to Kirkbride. Thus, the precise question regarding inconsistent verdicts is whether Brannon communicated a materially different message about the Verizon opportunity than Rice or whether plaintiffs had different opportunities to become "aware of the true . . . facts."

In evaluating these two e-mails, it is important to appreciate the dramatically different roles of Rice and Brannon and therefore, the reasonable weight or "materiality" of each communication: Rice was the founder and CEO of Neogence, whereas Brannon was a physician serving as an outside board member without technical expertise. Part of Brannon's role as a director was to help identify potential angel investors. Both plaintiffs knew of Brannon's limited role. In his short 30 April 2010 e-mail, Brannon quickly summarized the possible Verizon opportunity and asked the recipients to take time to read the more detailed e-mail to follow from Rice. By copying Rice with the email, Brannon provided Rice had an opportunity to correct any misstatement. Further, any ambiguities created by the Brannon e-mail were clarified by the more detailed Rice e-mail, which Brannon referenced and urged the recipients of his email to read.

Upon reaching its verdict regarding Piazza, to the extent that the jury found that Brannon misrepresented that Neogence had an opportunity to become Verizon's featured AR software provider, the jury reached that decision in the face of evidence

that Rice made the same express representation. Nevertheless, the majority contends that Brannon "made more direct, less nuanced, comments" and gave less "accurate descriptions" to Piazza "concerning the extent to which Neogence had the opportunity to have Mirascape preloaded onto Verizon phones than Mr. Rice did." Because of this alleged distinction, the majority concludes that the jury could have reasoned that Rice did not make any misrepresentations to Piazza but that Brannon did so based on an "omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." N.C.G.S. § 78A-56(a)(2) (2017).

The majority's distinction is one without a difference. Brannon's e-mail specifically stated that the more detailed (nuanced) information about the potential opportunity would come from Rice. Brannon's short e-mail is exactly the kind of e-mail one would expect a busy physician to send to other busy people. Rice received a copy of the email and, as the CEO, had the opportunity to correct any misstatement. Furthermore, Rice's longer, detailed communications conveyed additional information needed by the potential investors, such as the statement that Neogence might have an opportunity to "leverage [Verizon's] marketing." Regardless of the comparative length of or detail in the e-mails, Rice expressly represented that Neogence had a real chance "to become the featured AR application for Verizon, OEM'd on all of the DROID smartmobiles."

Regarding Lampuri's claims, Lampuri learned of the potential Verizon opportunity from Brannon at Brannon's medical office on 25 May 2010 when the two had a brief conversation during a prenatal appointment for Lampuri's wife. This setting was not one in which a person expects to receive precise details of an investment opportunity. According to Lampuri, Brannon represented that "our director of sales just got back from New York City at a meeting"; "[t]here were Verizon executives there, and they were absolutely blown away by our technology," and "Neogence needed to go back, create this demo, come back and show Verizon, you know, what they've been talking about, what they've been showing about this technology and they're going [to] get OEMed. They're going pre-installed on all Verizon phones." Afterwards, Lampuri pursued the opportunity by meeting with Cummings, Kirkbride, and Rice at Neogence's headquarters in July 2010 to learn the details of the investment opportunity directly from Cummings. Cummings confirmed the essence of Brannon's statements. According to Lampuri, Rice "reiterated to them that the [Verizon] deal was very much real. They were seeking funds to, you know, create that demo and finish it so they could do--you know, give a live demo to Verizon."

The majority argues that Rice's representations to Lampuri were obviously different than Brannon's in that Rice did not specifically detail the nature of the Verizon opportunity. Though Rice's statements to Lampuri were comparatively vague, they were no different than Brannon's given the context in which they were made. According to Lampuri's testimony, immediately preceding Rice's statement at

their first meeting, Cummings had relayed that the result of his initial meeting in New York was that Verizon was "absolutely wowed by the technology, that we need--they needed to go back, create a demo, go back to Verizon in a couple weeks and if they--if they wowed Verizon, . . . then they have the opportunity to be preloaded, OEMed on all phones." Just before an additional interaction with Rice, Lampuri heard from Cummings that Cummings had been in New York to meet with an advertising agency "and it just so happened Verizon executives were in the meeting, blown away by the technology. You guys need to go back, create this demo, come back to us and you guys have a possibility of being our featured AR application OEMed on all phones."

As such, Cummings's descriptions of the Verizon "deal" as reiterated by Rice were substantively indistinguishable from Brannon's representations. Indeed, the jury heard from Lampuri that Cummings "discussed and reiterated basically what Greg [Brannon] had said." Rice then effectively affirmed and adopted this description of the Verizon opportunity when he represented to Lampuri on both occasions that the "deal" was "very much real" without offering any other information to correct or modify Cummings's representations. While the majority ignores the timing of the various representations to Lampuri, it is crucial. At the time of Brannon's May statement, the Verizon opportunity deadline was weeks away. That deadline, however, passed. During this critical time, Lampuri had several discussions with Rice and Cummings. Significantly, Lampuri did not provide funds until 24

September 2010, well past the initial deadlines, and many months after Brannon's alleged misrepresentation.

Also, the majority ignores the second aspect of the jury's verdict of liability that each plaintiff "was unaware of the true or omitted facts." Even if there were a "material" difference in the representations made by Rice and Brannon, neither plaintiff can show he did not learn of the true details of the Verizon opportunity by talking directly to the one Neogence person who was present at the meeting, Cummings. Before plaintiffs invested in the company, both had multiple conversations with Cummings as well as Rice and Kirkbride. These direct conversations with these corporate officers would have corrected any possible confusion Brannon, the physician without technical expertise and an outside board member, may have created regarding the potential opportunity with Verizon. No person would have reasonably relied on the statement of one *absent* from a meeting after consulting with one *actually present*.

The timing of the investments makes clear that neither plaintiff relied on Brannon but only invested after extensive conversations with Cummings as well as Rice and Kirkbride. Piazza first loaned money to Neogence in February 2010, but, after talking directly with Cummings and being visited by Rice and Kirkbride, on 28 May 2010, Piazza loaned the additional $150,000 to Neogence. Even though his in-person communication with Brannon took place on 25 May 2010, Lampuri did not invest until 24 September 2010, four months after his brief conversation with

27

Brannon and after he had spoken several times to Cummings, Kirkbride, and Rice about the same Verizon opportunity, and well after Neogence had missed the initial July deadline with Verizon.

Given the evidence, it is impossible to reconcile the jury's verdicts that Brannon made misrepresentations to plaintiffs, thus subjecting him to securities fraud liability, while Rice made no such misrepresentations. Given the evidence, it is likewise impossible that plaintiffs did not know of the true details of the opportunity after discussing it with the only Neogence officer present at the 30 April 2010 meeting as well as corporate officers, Rice and Kirkbride. If Rice accurately stated the potential opportunity, as the majority suggests, Rice would have simultaneously informed plaintiffs of the "true" opportunity. Because these verdicts absolve one defendant from liability and subject the other to liability based on substantively indistinguishable statements, it would be a substantial miscarriage of justice to allow these verdicts to stand. Therefore, the trial court abused its discretion by denying Brannon's motion for a new trial.

### III. Director Safe Harbor Jury Instruction

The trial court erred by failing to give the requested director safe harbor jury instruction; accordingly, Brannon is entitled to a new trial on this ground as well. Whether a jury instruction correctly explains the law is reviewable de novo. *E.g.*, *Moss v. Brown*, 199 N.C. 189, 192, 154 S.E. 48, 49 (1930); *see also Kinsey v. Spann*, 139 N.C. App. 370, 372, 533 S.E.2d 487, 490 (2000) (A motion for new trial involving

28

a question of law is reviewed de novo. (citation omitted)); *McNeill v. McDougald*, 242 N.C. 255, 259, 87 S.E.2d 502, 504 (1955). An erroneous jury instruction of the law regarding "a substantive phase of the case is prejudicial error," *White v. Phelps*, 260 N.C. 445, 447, 132 S.E.2d 902, 904 (1963) (per curiam), "even though given in stating the contentions of the parties," *Blanton v. Carolina Dairy, Inc.*, 238 N.C. 382, 385, 77 S.E.2d 922, 925 (1953). An instruction placing the burden of proof on the wrong party is prejudicial. *E.g.*, *Banks v. Shepard*, 230 N.C. 86, 91, 52 S.E.2d 215, 218 (1949).

This Court has stated:

> [W]hen a request is made for a specific instruction, correct in itself and supported by evidence, the trial court, while not obliged to adopt the precise language of the prayer, is nevertheless required to give the instruction, in substance at least, and unless this is done . . . the failure will constitute reversible error.

*Minor v. Minor*, 366 N.C. 526, 531, 742 S.E.2d 790, 793 (2013) (alterations in original) (quoting *Calhoun v. State Highway & Pub. Works Comm'n*, 208 N.C. 424, 426, 181 S.E. 271, 272 (1935)). "Accordingly, we consider whether the instruction requested is correct as a statement of law and, if so, whether the requested instruction is supported by the evidence." *Id.* at 531, 742 S.E.2d at 793 (citing *Calhoun*, 208 N.C. at 426, 181 S.E. at 272); *see also Gwyn v. Lucky City Motors, Inc.*, 252 N.C. 123, 127, 113 S.E.2d 302, 305 (1960) (The quantum of proof required to support a requested instruction is "more than a scintilla.").

a. Preservation

The first question is whether Brannon preserved the safe harbor jury instruction issue by making an adequate request to the trial court. Contrary to the majority's view, Brannon's counsel plainly raised the defense before, during, and after trial, and preserved for review the proposed jury instruction, by asserting Brannon acted within the scope of his corporate director duties in his communications with plaintiffs. The majority concludes that the pattern jury instruction incorrectly states the law by placing the burden of proof on plaintiffs and, as a result, the requesting party should have produced a special written instruction. The statute, however, places the burden of proof on plaintiffs; thus, the requested pattern jury instruction correctly states the law, and the trial court should have instructed the jury accordingly.

A party may not appeal a jury instruction, or lack thereof, unless the party objects and states the grounds of the objection, "provided that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury." N.C. R. App. P. 10(a)(2). Here in accordance with Rule 10(a)(2), Brannon did make a timely objection to the trial court's decision to deny the requested jury instruction at issue.

In the pretrial order, counsel defined the jury issue as, *inter alia*, "Were the Plaintiffs . . . damaged by the failure of [defendant Brannon] to discharge his duties as a corporate director? (N.C.G.S. §[ ]55-8-30)." At the close of plaintiffs' evidence, counsel argued for dismissal in that, "as [a] director," Brannon is "shielded from

liability . . . in compliance with General Statute 55-8-30." At the charge conference, defense counsel requested the corresponding pattern instruction 807.50, noting again that "this statute," section 55-8-30 and its protections, "needs to be inserted" in the jury instructions. Defense counsel included in his proposed jury instructions North Carolina Pattern Instruction Civil 807.50, titled "Breach of Duty-Corporate Director." During the charge conference, defense counsel proposed N.C.P.I. Civil 807.50 to invoke the defense for a director who relies on information provided by a corporate officer pursuant to N.C.G.S. § 55-8-30. The trial court denied the proposed instruction on the basis that the instruction placed the burden of proof on plaintiffs instead of on Brannon, at which time Brannon's counsel suggested crafting a different instruction. Apparently, no acceptable instruction was presented.

Therefore, before the conclusion of the charge conference, Brannon renewed his objection to the instructions and argued the propriety of the pattern jury instructions based on N.C.G.S. § 55-8-30. The trial court noted the objection and denied the requested jury instructions. In his post-trial motions, counsel argued that Brannon, as a corporate director, "was entitled to rely on the information he received from John Cummings and repeated to plaintiffs as a matter of law," that "[o]ne of the duties of a director is seeking capital investment in the company," and that the trial court erred by instructing instead "on the general standard of reasonableness." Brannon certainly raised, and plainly preserved, this issue for appeal. *See State v. Maske*, 358 N.C. 40, 53, 591 S.E.2d 521, 530 (2004); *see also* N.C. R. App. P. 10(b)(2).

b. Correct Statement of the Law

The next question is whether the proposed jury instruction was a correct statement of the law. The majority, agreeing with the trial court, holds that the requested instruction incorrectly stated the law because of the allocation of the burden of proof. A proper analysis requires consideration of two statutes, those addressing the director safe harbor and securities fraud.

i. Director Safe Harbor

The statutory director safe harbor necessarily protects directors in the midst of "[t]he growing complexity of business affairs," which requires "directors to rely on other corporate personnel as well as outside experts in discharging their responsibilities." Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 14.05 (7th ed. 2014). In recognition of the important policy of encouraging individuals to serve as corporate directors, the General Assembly created the statutory director safe harbor to supplement the common law protection of the business judgment rule. Section 55-8-30 of our General Statutes, which governs the general conduct of corporate directors, recognizes the safe harbor as a defense for a director discharging his duties:

> (a) A director shall discharge the director's duties as a director . . . in accordance with all of the following:
>
> (1) In good faith.
>
> (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances.

32

(3) In a manner the director reasonably believes to be in the best interests of the corporation.

(b) In discharging the duties of a director's office, a director is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by any of the following:

(1) One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented.

N.C.G.S. § 55-8-30(a)-(b) (Supp. 2018). "A director is not entitled to the benefit of subsection (b)," that is relying on information provided by corporate officers, "if the director has *actual knowledge* concerning the matter in question that makes reliance otherwise permitted by subsection (b) of this section unwarranted." *Id.* § 55-8-30(c) (Supp. 2018) (emphasis added). Otherwise, "[a] director is not liable for [ ] any action taken as a director, or any failure to take any action, if the director performed the duties of the director's office in compliance with this section." *Id.* § 55-8-30(d) (Supp. 2018). Thus, under the statute, a director discharging his corporate duties is entitled to rely in good faith on a corporate officer's representation without incurring personal liability, absent actual knowledge that the statement is false.[6]

---

[6] Providing further insight into the importance of the director safe harbor statute, North Carolina's common law business judgment rule likewise protects corporate directors from personal liability stemming from the performance of their corporate duties. *Braswell v. Pamlico Ins. & Banking Co.*, 159 N.C. 628, 631, 75 S.E. 813, 814 (1912) ("Directors of corporations are not guarantors . . . . They do not insure the corporation against loss arising either from their own honest mistakes or from the mistakes of subordinate

officers."). Injured parties are generally free to sue the corporation itself, but "[d]irectors must have the freedom to take risks and the power to manage the business without undue interference from . . . the courts. That freedom is achieved by protection from liability for good faith errors in judgment and deference from the courts in business decisions." *First Union Corp. v. Suntrust Banks, Inc.*, Nos. 01-CVS-10075, 01-CVS-8036, CIV. A. 01-CVS-4486, 2001 WL 1885686, at \*4 (N.C. Super. Ct. Aug. 10, 2001).

Likewise, other states echo these fundamental principles embodied in the "business judgment rule," *State ex rel. Comm'r of Ins. v. Custard*, No. 06 CVS 4622, 2010 WL 1035809, at \*20-21 (N.C. Super. Ct. Wake County (Bus. Ct.) Mar. 19, 2010), which operates both procedurally and substantively, *Emerald Partners v. Berlin*, 787 A.2d 85, 90-91 (Del. 2001); *see also In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009) ("[I]f the directors employed a rational process and considered all material information reasonably available—a standard measured by concepts of gross negligence"—no personal liability extends. Moreover, "a showing of bad faith is a *necessary condition* to . . . liability.").

Substantively similar to N.C.G.S. § 55-8-30(b), the common law business judgment rule provides directors a "safe harbor" which allows them to rely in good faith upon the representations of their corporation's officers. *See Arthur v. Griswold*, 55 N.Y. 400, 406 (1874) ("The mere fact of being a director . . . is not *per se* sufficient to hold a party liable for the frauds and misrepresentations of the active managers of the corporation. Some knowledge of . . . the act claimed to be fraudulent must be brought home to the [director] charged." (citation omitted)); *see also, e.g.*, *Utley v. Hill*, 155 Mo. 232, 242-47, 273-76, 55 S.W. 1091, 1092-93, 1103-04 (1900) (Bank directors were not liable for deceit because they relied in good faith on financial reports of cashier.).

Like N.C.G.S. § 55-8-30(c), absent actual knowledge of the falsity of the officer's representation, the business judgment rule shields directors from personal liability in this context. *See Brehm v. Eisner*, 746 A.2d 244, 261-62 (Del. 2000) (en banc); *see also Graham v. Allis-Chalmers Mfg. Co.*, 41 Del. Ch. 78, 85, 188 A.2d 125, 130 (Del. 1963) ("[D]irectors are entitled to rely on the honesty and integrity of their subordinates until something occurs to put them on suspicion that something is wrong.").

Though similar, the statutory protection is separate from the business judgment rule and does not supplant its common law protections. *State ex rel. Long v. ILA Corp.*, 132 N.C. App. 587, 601, 513 S.E.2d 812, 821 (1999) ("[Section 55-8-30] does not abrogate the common law of the business judgment rule."); *see* N.C.G.S. § 55-8-30 official cmt. (1991) ("[T]he business judgment rule and the circumstances for its application are . . . developed by the courts. . . . [S]ection 8.30 does not . . . codify the business judgment rule . . . ."). "The possible application of the business judgment rule need only be considered if compliance with the standard of conduct set forth in . . . section 8.30 is not established." N.C.G.S. § 55-8-30 official cmt. sec. 4. Therefore, "proper analysis requires examination of defendant's actions in light of [both] the statutory protections . . . and the business judgment rule, either or both of which could potentially insulate him from liability." *ILA Corp.*, 132 N.C. App. at 601-02, 513 S.E.2d at 821.

*Newby, J., dissenting*

To assert this defense Brannon requested North Carolina Pattern Instruction Civil 807.50, titled "Breach of Duty-Corporate Director."  The proposed instruction included the following language:

> "Was the plaintiff damaged by the failure of the defendant to discharge his duties as a corporate director?"
>
> *On this issue the burden of proof is on the plaintiff. This means that the plaintiff must prove*, by the greater weight of the evidence . . . :
>
> . . . .
>
> . . . that the defendant failed to act as an ordinarily prudent person in a like position would have acted under similar circumstances.  (Unless he has actual knowledge to the contrary, a director is entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by
>
> [one or more employees of the corporation who the director reasonably believes to be reliable and competent in the matter(s) presented]

---

As a procedural hurdle, a plaintiff must "rebut the presumptive applicability of the business judgment rule" to pursue a personal claim against a corporate director.  *Emerald Partners*, 787 A.2d at 91; *accord Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1374 (Del. 1995); *ILA Corp.*, 132 N.C. App. at 602, 513 S.E.2d at 821-22 (citation omitted).  The rule thus "places the initial burden of proof on the plaintiff," *Emerald Partners*, 787 A.2d at 91 (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995)), by requiring an affirmative showing that "the board of directors, in reaching its challenged decision, violated" the board's directorial duties, *id.*; *see also Unitrin, Inc.*, 651 A.2d at 1374 ("[T]he plaintiff has the initial burden of proof and the ultimate burden of persuasion."); *ILA Corp.*, 132 N.C. App. at 602, 513 S.E.2d at 821-22 (same).  The presumption "is rebutted [only] in those rare cases where the decision under attack is 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.' " *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999) (en banc) (quoting *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 780-81 (Del. Ch. 1988)).

(Emphasis added.) (Footnote call numbers and italics omitted.) Defense counsel submitted the proposed instruction to the trial court, which declined to give it because the proposed instruction placed the burden of proof on plaintiffs. This decision was error because the trial court misapplied, and now the majority misapplies, the securities fraud statute in light of the director safe harbor provision.

### ii. Securities Fraud

The securities fraud statute, N.C.G.S. § 78A-56(a)(2), pled by plaintiffs, states that a person who:

> (2)  Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission,

> is liable to the person purchasing the security from him . . . upon the tender of the security . . . .

N.C.G.S. § 78A-56(a)(2) (2017). This statute is directed at those who are personally and financially profiting from the transaction. *See Pinter v. Dahl*, 486 U.S. 622, 654, 108 S. Ct. 2063, 2082, 100 L. Ed. 2d 658, 687 (1988) ("Typically, a person who solicits the purchase will have sought or received a personal financial benefit from the sale, such as . . . a brokerage commission." (citation omitted)). The express language says liability extends to the person "purchasing the security from him." Here, while as a

director, Brannon encouraged plaintiffs to invest in Neogence, plaintiffs "purchased" the securities from the company with the prompting of the corporate officers, Rice, Kirkbride, and Cummings.

There are real questions regarding the applicability of this statute to an outside director who, acting for the corporation, seeks investments without receiving any personal gain. The actual seller of the security was Neogence, not Brannon. Brannon had no authority to accept the loans from investors or to sign the promissory note agreements. And if Brannon is a seller, what degree of knowledge (scienter) is required? Further, securities fraud is not a strict liability offense, and a plaintiff must prove that he would not have purchased the security absent the material misrepresentation. Finally, does this statute make an outside director who did not issue the note primarily liable, or would N.C.G.S. § 78A-8(2) or N.C.G.S. § 78A-56(c) be correct statutes to assess an outside director's liability? *See* N.C.G.S. § 78A-8(2) (2017) (imposing liability on "any person, in connection with the offer, sale or purchase of any security, directly or indirectly," who made a material misrepresentation or omission "in light of the circumstances" and upon which a plaintiff relied); N.C.G.S. § 78A-56(c)(1) (2017) (providing for potential secondary joint and several liability for an implicated "director").[7] Regardless, the necessary analysis here does not require resolution to these significant questions.

---

[7] The majority states, "This Court has 'consistently denied appellate review to [parties] who have attempted to assign error to the granting of their own requests.'"

Reading the director safe harbor statute *in para materia* with the securities fraud statute, the Court must resolve the conflict regarding which party bears the burden of proof, or in other words, which party must show whether the director exercised reasonable care. The trial court concluded, and now the majority affirms, that the securities fraud statute places the burden of proof on defendant, eliminating the significant protections of the director safe harbor statute. I disagree. In light of the significant public policy considerations that clearly favor the need for outside directors and their protection, the correct reading of the statute requires plaintiff to prove that the director acted without reasonable care in relying on the representations of a corporate officer. Thus, the requested pattern jury instruction is correct; there was no need for a written special instruction. The majority's assertion that defendant's director safe harbor defense "was a subordinate feature of the present case" ignores the fact that Brannon raised the defense at every opportunity.

As a director discharging his corporate duties by introducing potential angel investors to Neogence, Brannon is entitled to rely in good faith on the corporate officers' representations without incurring personal liability, absent actual knowledge that those statement were false. Plaintiffs bear the burden of proving otherwise. The director safe harbor instruction was appropriate because there was

---

(quoting *State v. Wilkinson*, 344 N.C. 198, 213, 474 S.E.2d 375, 383 (1996)). Just recently, however, this Court allowed and upheld a challenge to an instruction submitted by the party who subsequently objected. *See Justus v. Rosner*, ___ N.C. ___, ___, 821 S.E.2d 765, 769-72 (2018); *id.* at ___, 821 S.E.2d at 780-81 (Newby, J., dissenting).

sufficient evidence that Brannon's conduct falls within the scope of its protection. The trial court erred in denying Brannon's request for that jury instruction.

Plaintiffs' own complaint, as well as the parties' stipulations in the pretrial order, recognize and affirm that "at all relevant times material to this action, Kirkbride, Brannon, and Rice served on Neogence's board of directors." *See Ussery v. Branch Banking & Tr.*, 368 N.C. 325, 340, 777 S.E.2d 272, 282 (2015) ("[A] plaintiff's . . . assertions cannot overcome his own evidence to the contrary."). Brannon presented ample evidence that the solicitation of start-up funds for Neogence falls squarely within the scope of his duties as a corporate director. *See State v. Harvell*, 334 N.C. 356, 364, 432 S.E.2d 125, 129 (1993) ("If a request is made for a jury instruction which is correct in itself and supported by evidence, the trial court must give the instruction . . . ."). In fact, Neogence recruited Brannon as an outside director precisely for this purpose. *See Burlington Indus. v. Foil*, 284 N.C. 740, 758, 202 S.E.2d 591, 603 (1974) ("The business and affairs of a corporation are ordinarily managed by its board of directors." (citation omitted)); *see also* N.C.G.S. § 55-8-30 official cmt. (2017) (noting "the board may delegate or assign to appropriate [representatives] of the corporation the authority or duty to exercise [certain] powers"). Kirkbride invited Brannon to the board to secure "financing, investors, et cetera." Rice stated that Brannon "would make introductions to people that might have an interest in what [Neogence was] doing." As Brannon characterized it, he would "expos[e] this company to friends that may want to invest into it."

39

Brannon received no commissions or independent compensation for his solicitation efforts. *See Smith v. Van Gorkom*, 488 A.2d 858, 872-73 (Del. 1985) (en banc) (Generally, a director only acts outside of those corporate duties when he or she acts for his or her own personal gain, or in bad faith or self-interest.)*, overruled on other grounds by Gantler v. Stephens*, 965 A.2d 695, 713 n.54 (Del. 2009) (en banc); *see also Pinter*, 486 U.S. at 654, 108 S. Ct. at 2082, 100 L. Ed. 2d at 687 ("Typically, a person who solicits the purchase will have sought or received a personal financial benefit from the sale, such as . . . a brokerage commission." (citation omitted)). By stating his understanding of the Verizon opportunity, Brannon encouraged, but did not otherwise participate in, the investments.

Moreover, Brannon presented ample evidence that he relied on Cummings's statements to the directors. *See Harvell*, 334 N.C. at 364, 432 S.E.2d at 129. The complaint itself reveals that Brannon did so, stating, "On or about April 30, 2010, Brannon sent an e-mail to . . . investors stating that Neogence's chief sales officer, John Cummings ('Cummings'), 'just had a meeting in NY with Verizon . . . .'" Only after Cummings reported to the board and directors regarding the Verizon opportunity did the directors, not just Brannon, solicit funds from plaintiffs. Moreover, plaintiffs made their loans to Neogence following their in-person meetings with Cummings, which Brannon did not even attend.

Brannon's directorial conduct is precisely at issue, which plaintiffs' own complaint contemplates and in support of which defense counsel presented evidence

and argued before the trial court. If Brannon acted as a director and did not know the statement was false or misleading, he was entitled to rely in good faith upon it. *See* N.C.G.S. § 55-8-30 official cmt. ("[A] director is not liable for injury or damage . . . , no matter how unwise or mistaken . . . , if in performing his duties he met the [conduct] requirements of section 8.30."). Plaintiffs bear the burden of establishing either that Brannon was not acting within the scope of his directorial duties, and hence the safe harbor protection does not apply, or, to rebut the good faith presumption, that he acted with gross negligence or with actual knowledge that Cummings's representations were false. In fact, the trial court further misstated the law by instructing the jury that "a defendant is liable for making a false or misleading statement in soliciting the purchase of a security *even if he did not know* that [Cummings's] statement was false or misleading."

Providing adequate protection for outside directors is a fundamental consideration in the corporate context. Brannon did not waive his statutory rights under the director safe harbor, *see State ex rel. Long v. ILA Corp.*, 132 N.C. App. 587, 602, 513 S.E.2d 812, 821 (1999); *see also* N.C.G.S. § 55-8-30 official cmt. sec. 4, and is entitled to a proper jury instruction on his role as a corporate director.

> The majority's unnecessarily restrictive reading of the Safe Harbor provision will discourage qualified persons from agreeing to serve as unpaid, independent outside directors for corporate governance. If a director, particularly an independent outsider, cannot rely upon the statements of company employees, officers, and consultants in soliciting funds without being subject to

41

securities fraud liability the majority imposes here, there
is little incentive to serve at all.

*Piazza v. Kirkbride*, 246 N.C. App. 576, 623, 785 S.E.2d 695, 724 (2016) (Tyson, J.,

concurring in part and dissenting in part).

## IV. Conclusion

Brannon's statements to plaintiffs were materially the same as those of Rice.

Plaintiffs did not solely or primarily rely on Brannon's statements about the Verizon

opportunity but consulted directly with the one person who was present at the

meeting, Cummings, as well as corporate officers Rice and Kirkbride. The verdicts

holding Brannon responsible, but not Rice, are irreconcilable and result in a

substantial miscarriage of justice. Furthermore, Brannon, as a corporate director,

was entitled to the director safe harbor instruction, which was properly preserved

and erroneously denied by the trial court. As a result, Brannon should be granted a

new trial. Accordingly, I respectfully dissent.